## McCallum *versus* The Germantown Water Co.

1. A prescription to render running water unfit for drinking or domestic purposes requires the strictest proof.

2. No one has a right so to use water through his land, as to foul it or render it corrupt or unhealthy and unfit to be used by the landowner below for domestic purposes.

3. If an upper riparian proprietor claims the right by prescription to pollute the stream, he cannot do it to a greater extent than it was polluted at the commencement of the twenty-one years.

4. The right must be measured by the enjoyment; it cannot be used in a different and more extensive manner.

5. The Court of Common Pleas is one of both law and equity, presided over by the same judges who are competent to decide any question of law, and who if they deem an issue to try a fact necessary are the tribunal to try it.

6. There is no reason why the Supreme Court in banc or at Nisi Prius, and the Court of Common Pleas, may not finally decide a case where there is no actual dispute of law or fact.

APPEAL from the decree of the Court of Common Pleas of *Philadelphia* : In Equity.

This proceeding was commenced by bill by the Germantown Water Company against William McCallum, filed November 7th 1862. The bill set forth that the complainants were incorporated on the 29th of March 1851, for the purpose of supplying the citizens of Germantown with water, and were authorized to purchase and hold springs and streams of water and lands to which they may be appertenant, and to erect necessary works : that in pursuance of this authority they purchased a tract of land on both branches of Crab creek, or Paper Mill run, and the right to use the water of said run and its tributaries, and erected a dam, reservoirs, engine-house, &c., with all the necessary apparatus, at great expense, and had from that time been supplying water to the people of Germantown from these works : that at the time they acquired these rights to the water it was pure and unpolluted, and neither the defendant or any other person had a right by prescription or otherwise to use the waters so as to corrupt or pollute them ; that until within four or five weeks of the filing of the bill the water had been pure, but at that time it had become contaminated and impure by substances introduced into it from the defendant's factory, located on the said creek, above the complainants' works : that the factory of the defendant had until lately been used for manufacturing carpets, and whilst so used had done no injury to the complainants, nor polluted the water ; but that recently the defendant had been using his factory for making blankets, and since such use, had contaminated the stream by substances from his factory, which made the water unwholesome and unfit for drinking purposes : and prayed for an injunction restraining the defendant from polluting the waters, &c.

[McCallum *v.* Germantown Water Co.]

The case was heard below on a motion for a special injunction and upon affidavits.

The court then refused to grant the injunction; but appointed a commission, composed of Dr. R. E. Rogers, Dr. Joseph Leidy and Strickland Kneass, to examine and report as to the causes of the alleged nuisance.

The commission reported January 12th 1863, detailing the particulars of their examinations, and declaring as their conclusion " that the source of the impure water can be traced only to the carpet works."    One of the commissioners, Mr. Kneass, added to his report that " a simple arrangement of piping from the factory, or a subsiding or storing reservoir for this refuse, would prevent all trouble."

On the 16th of February 1863 the court granted a special injunction, and security was entered November 14th 1863.

On the 15th of January 1864 the defendant filed his answer, setting forth that the premises on which his factory was erected were owned in 1813 by Jacob Clemens, who had then on them a woollen factory, and that he and his successors carried on the manufacturing of woollen goods until 1831, when the premises were conveyed to Andrew McCallum, for the firm of A. McCallum & Co., of which the defendant was the other member; that the refuse water and materials resulting from the manufactures were then discharged into Paper Mill run, and were carried past the site of the complainant's works into the Wissahickon; that A. McCallum & Co., upon their purchase, commenced, as their principal business, the manufacture of woollen carpets, but from time to time, as the demands of trade warranted, made baize, blankets, &c.; that A. McCallum in 1855 devised these premises, with other estate, to the defendant, and he having associated with him other partners, the firm has carried on the same branches of woollen manufacture till the time of the answer; that in September 1861 the firm commenced making blankets for the United States, and have continued, with the intermission of a few months, to use their mill in part for that manufacture, making carpets in conjunction with the blankets; that Clemens, the original owner, and his successors, including the defendant, have used the water of Paper Mill run for making steam, washing, dyeing, and all other purposes incident to the manufacture of woollen goods, and have discharged the refuse water into the stream at pleasure; that the defendant has not since the commencement of the manufacture of army blankets discharged into the run any new or unaccustomed deleterious substance, nor has he increased the discharge of refuse matter; that Paper Mill run is the natural and necessary means of drainage for a thickly settled tract of country for over two miles above the plaintiff's works, and this drainage must, from the nature of country, for ever pass along the run; that the com-

plainants, at the time of their incorporation and the building of their works, were aware of the existence of the defendant's mill and his usage to discharge its refuse water into Paper Mill run ; were acquainted with the other causes of the impurity of the stream, and did not rely on it solely, but undertook to lead water from springs in the vicinity to their works, and constructed appliances to carry away impurities from the stream. The defendant submitted to the court that the plaintiffs could not, after such knowledge and recognition of his right, have an injunction against him till the title shall be decided at law ; and averred that the plaintiffs have no rights in respect to Paper Mill run inconsistent with the defendant's right to discharge the refuse waters from his mill into the run in the course of his business, and that he had the full right to discharge the refuse water from his factory into Paper Mill run in such manner as might be necessary in the course of his business, without let or hindrance from the plaintiffs or any other persons.

The plaintiffs afterwards filed a replication, and an examiner was appointed.

The testimony taken related to the character of the water as to purity before and after the winter of 1861–62, and the length of time for which the defendant and his predecessors had discharged the waste water and refuse matter from the factory into Paper Mill run. A synopsis of the testimony is found in the opinion of his Honor, Judge Read. After hearing, the Court of Common Pleas (Ludlow, A. J.), on the 30th of December 1865, decreed that the injunction formerly granted in this case, on the 16th day of February 1863, be made perpetual.

The defendant appealed, and assigned for error that the court erred :—1. In granting the injunction prayed for in the plaintiff's bill.

2. In not limiting the decree to the enjoining of the defendant from discharging any refuse matters from the factory into the stream which should be in excess of what he had a prescriptive right so to discharge therein.

*A. H. Smith*, for appellant.—The defendant had acquired a prescriptive right to discharge his refuse water into Paper Mill run to some extent, and had not used this right in excess of his right during the time complained of. Courts of equity will not ordinarily decide that a nuisance exists when the fact is controverted, but will require the party first to establish his right at law : Burnham *v.* Kempton, S. C. of N. H., 3 Am. Law Reg. 379 ; Dana *v.* Valentine, 5 Metc. 8 ; Attorney-General *v.* Cleaver, 18 Ves. 211 ; Commissioners *v.* Long, 1 Pars. 146 ; Crenshaw *v.* State River Co., 6 Rand 245 ; Angell on Watercourses, § 453, p. 520 n.

The change, disuse, resumption or modification of the manu-

facture of goods used to be made at the factory, or the alteration or renewal of any machinery, would not affect the prescription of the defendant if in the ordinary course of his business: Simpson *v.* Seavey, 8 Greenl. 138 ; 5 Paige 597. Nor would the disuse for less than twenty-one years destroy it: Haight *v.* Morris Aqueduct Co., 4 Wash. 601 ; Dana *v.* Valentine, 5 Metc. 8.

The acquiescence of the plaintiffs and those under whom they claim for so long a period, deprives them of the right to stop the defendant's works by the summary process of injunction: Birmingham Canal Co. *v.* Lloyd, 18 Ves. 515 ; Supplement to Drewry on Inj. 5, and cases cited ; Wood *v.* Sutcliffe, 8 Eng. Law & Eq. 217.

Paper-mill run has been used to carry off the refuse waters from these works for a time far exceeding that required to gain a right by prescription. Within that period all of the numerous streams falling from the ridge of high lands north-west of Philadelphia have become the seats of great and important manufactures. These establishments are necessarily dependent on the natural drainage of the country for carrying off their refuse.

The builders of these establishments rely not on prescription, but on the custom of the country and the necessity of the case, as well as upon the acquiescence of parties who may be supposed to be injured, for the protection of their rights of drainage.

The principle contended for by the plaintiffs would enable any manufacturing village on the banks of a creek, seeking to pump water for its own accommodation from the bed of the stream, to shut all the factories and mills on the upper water of the stream, in order that it might have the water pure and uncontaminated.

The difficulty was met in Wood *v.* Sutliffe, 8 Eng. Law & Eq. 217, though there had been a verdict and nominal damages for plaintiff in that case.

The case of Wheatley *v.* Chrisman, 12 Harris 298, was rightly decided, and does not militate against the right of the defendant in this case, for that was in a rural district. Besides, there was no prescription or acquiescence in that case as there is in this. That, too, was an action at law.

Hole *v.* Barlow, 4 C. B. Rep. N. S. 334, and Bamford *v.* Tarley, 9 Jurist 377, N. S., relate to injuries arising from the recent establishment of offensive trades.

In St. Helen's Smelting Works *v.* Tipping, lately decided in the House of Lords, 5 Am. Law Reg. N. S. 104, it was found by the jury that the defendant's business of copper smelting was not carried on in a proper place.

The American cases have recognised, perhaps more fully than the English ones, the necessity of subordinating the rights of riparian owners in some cases to the commercial and manufacturing interests of the country : Veazie *v.* Dwinel, 3 Am. Law Reg.

[McCallum *v.* Germantown Water Co.]

715; Sup. Ct. of Maine; Tourtellot *v.* Phelps, 4 Gray 370, 376; Gould *v.* Boston Duck Co., 13 Id. 442; City of Springfield *v.* Harris, 4 Allen 494.

*J. B. Thayer,* for appellees.—Every riparian proprietor has a right to the enjoyment of a stream upon his land in its natural state, both as to quality and quantity. This right may be modified or lost entirely by acquiescence in an adverse use of the stream, so as to give to those so using it a prescriptive right. The extent of his prescriptive right must be measured by the enjoyment of it, and an increased or different use or enjoyment within the period for prescription, creates no right to maintain such excessive or different use: 3 Kent's Com. 554, note and cases cited; Angell on Watercourses, ch. 4, pp. 150, 152, 155; Darlington *v.* Painter, 7 Barr 473; Wheatley *v.* Chrisman, 12 Harris 298; Howell *v.* McCoy, 3 Rawle 256; Warner *v.* Hunter, 1 Phila. Rep. 414; Gale on Easements 227.

The right to the enjoyment of pure water upon one's land is a natural right, inherent in and co-extensive with the right to the land itself. The necessities of manufactories are no reason for taking away a private right without compensation. The constitution of the Commonwealth, in sec. 10 of art. 9, positively prohibits this very thing. The law in this state upon this point is well settled: Howell *v.* McCoy, 3 Rawle 256; Wheatley *v.* Chrisman, 12 Harris 302.

In England the principle contended for by the appellant was attempted to be established in Hole *v.* Barlow, 4 C. B. 344. In less than two years the doctrine set forth in Hole *v.* Barlow was doubted in The Stockport Water Co. *v.* Potter, 7 Jurist, N. S. 882, and in Bramford *v.* Thurley, 9 Id. N. S. 377, was directly overruled.

In Cavey *v.* Ledbetter, 9 Jurist, N. S. 798, Bramford *v.* Thurley was affirmed upon this very point, and finally in The St. Helen's Smelting Co. *v.* Tipping, a recent case in the House of Lords, 14 Am. Law Reg. (Dec. No. 1865) 104, it was for ever set at rest.

The opinion of the court was delivered, January 7th 1867, by

READ, J.—The Germantown Water Company was incorporated under the 18th and 19th sections of an Act of Assembly passed the 29th of March 1851, Pamph. L. 295, which substantially adopted the provisions of "An act to incorporate The Honesdale Water Company," passed the 14th of March 1850, Pamph. L. 497, as fully as if the 3d section and all the subsequent sections of the said act were thereby re-enacted, substituting the borough of Germantown and county of Philadelphia, for the borough of

[McCallum *v.* Germantown Water Co.]

Honesdale and county of Wayne, wherever the same are mentioned in the said act.

The president and managers of the company were authorized to purchase and hold, in fee simple, or for any less estate, any spring or springs, stream or streams of water, or any water-power or powers near or convenient to said borough; or any lands, tenements or hereditaments, to which any spring or springs, stream or streams of water, or any water-power or powers, may be appertenant, and convey said water into said borough by means of pipes, trunks, aqueducts, or in such manner as they shall deem most advisable and convenient; and should they find it necessary, proper cisterns or reservoirs for the reception thereof, with all the necessary powers of using the lands of individuals, and the public streets and grounds, in constructing the necessary works for supplying the borough with water. They are also authorized to erect fire-plugs or hydrants, to be used for extinguishing fires in said borough. Any person wilfully destroying or injuring, in any manner, any of the works belonging to the company, or wilfully corrupting or otherwise rendering unwholesome the spring or springs, stream or streams of water, which shall be conveyed or brought into said borough by said company, or in any way polluting, or rendering noxious or offensive the said water, shall forfeit and pay a sum not less than five nor more than one hundred dollars, at the discretion of the justice before whom suit is brought; and if such judgment is not paid, and no goods of such person can be found, whereof to levy the same by execution, then such person shall be committed to the county jail for any period not less than one nor more than fifty days, at the discretion of the justice rendering such judgment; "and shall remain liable for the full amount of damages to the said company in any other action instituted by them, and shall, moreover, be subject to and indicted for the same."

The said company was duly organized under said charters, and letters patent being issued in due form, the said company purchased a tract of land upon both branches of Crab creek or Paper Mill run, and erected thereon, at great expense, an engine-house, with engines and all the necessary pumping apparatus, reservoir, standpipe and other works. The said company, at great expense, erected a collecting-dam across the said creek, and built a reservoir at Mount Airy. The said plaintiffs, at the same time, purchased also the right to use the water of the said creek and its tributaries, for obtaining therefrom the necessary supply of water, to be furnished by means of their works, to the people of Germantown; and the water is conducted from the said Crab creek into the company's reservoirs, and thence, by means of iron pipes, distributed to the consumers of said water.

There are two reservoirs. The small one holds about one mil-

lion gallons of water—the larger one, built around it (the smaller one), holds about eleven million gallons of water when full, and could be filled with the present pumping apparatus. It is about twenty feet deep, and there is kept in it from eight to ten feet water. There are three dams—the upper dam, the main dam and the middle dam. There is a pumping-well thirty feet in diameter and thirty feet deep, and the springs have been led into the well, some by pipes, some by drains, and one very fine spring, immediately at the pumping-well, runs a stream from the rock into the well.

The lower dam was built as a reservoir or storing-dam ; the upper dams were built to prevent heavy deposits, &c., from going into the larger reservoir, and it is easier to remove that stuff from the upper dams than the lower ones. There is a pipe leading from the middle dam along the bottom of the main dam to the breast of the main dam, and through it with a ten-inch stop-cock on the upper side of the wall of the middle dam. On the appearance of a flood or rain, this ten-inch stop-cock is opened, to let as much of the muddy and turbid water pass through as possible. The waters of the pumping-well are separated from the waters of the main dam by double walls, built without cement or mortar, with a filtering-bed between them, composed of sand, charcoal and stones, about four feet wide ; and these walls are circular, and surround the well.

The sources of supply to the dam are principally from Paper Mill run and its tributaries. Paper Mill run rises south of Allen's lane, and above defendant's factory, and is of very little importance until increased by the streams flowing into it below the factory. The main stream itself being diverted from its regular course, by a race to defendant's mill, which is between one and a half and two miles above the dam. The character or quality of the water supplied by the tributaries to the main stream, three or four in number, is perfectly clear and sweet both to taste and smell, and so is the water of the main stream above the mill.

The iron piping put down at the expense of the water company, to supply its consumers, is twenty-one miles in length; the number of dwellings supplied is 681, which at six persons to a house, gives the population supplied with water at over four thousand persons, besides thirteen factories.

The evidence indisputably establishes the fact, that the water of the main stream and its tributaries is naturally sweet and clear, and fit for drinking, and all domestic purposes, and that if polluted or unwholesome it is entirely owing to the defendant's factory. Mr. Kneass, a civil engineer of great ability, and the chief engineer and surveyor of the city of Philadelphia, in concluding his report to the court below, says: " I therefore arrive

[McCallum v. Germantown Water Co.]

at the conviction that there is nothing in the geological formation of that section that can injuriously affect the character of the water. That there is not sufficient marsh or bog to give any evidence of discoloration with earth or vegetable matter.

"That the surface of the water-shed, as to its general use, its being covered with vegetation, with the character of material overlying the ·rock, is well adapted for the delivery of pure water ; and

"That the entire trouble existing from the impurity of water pumped and distributed by the water company is attributable to the refuse matter discharged into the creek of supply from the factory at Carpenter's lane. And in conclusion would add, that a simple arrangement of piping from factory or a subsiding or storing reservoir for this refuse would prevent all trouble."

Dr. Joseph Leidy, professor in the University of Pennsylvania, and a gentleman of great scientific acquirements, concludes his report to the court as follows :—

"As a result of these observations and investigations, I feel convinced that the great source of the pollution of the water of the Germantown Water Company lies in the operations of McCallum's factory, and that all other sources of impurity are so slight as to be of no importance."

Professor R. E. Rogers, another of the commission, concurred in these reports of Messrs. Kneass and Leidy, but was prevented by a very painful accident from preparing one himself.

In the joint letter of Dr. Leidy and Mr. Kneass, of the 12th January 1863, to the Court of Common Pleas, they said : "Upon comparing the results of our individual researches, we have, with unanimity, arrived at the conclusion, *that the sources of the impure water can be traced only to the Carpet Works.*"

The evidence clearly establishes that there was from 1851 to 1861, a period of ten years, no such impurity found in the waters at any time, that was not removed at the water works without difficulty before it was distributed to the consumers, but that after that period it became permanently impure and offensive, both to taste and smell, and entirely unfit for drinking, until the preliminary injunction was granted by the court in 1863, and that from that time it has continued to be sweet, pure, wholesome, drinking-water. It is therefore clear that the pollution of the water was caused by the defendant's factory, as proved by the scientific investigations prior to the issuing of the injunction, and it is equally clear that it must have proceeded from some different use of the defendant's mill or factory, beginning in 1861. The defence, therefore, that there was no pollution, and if there were, that it was not caused by the plaintiff's factory, fails, and there therefore remains only the last defence, that the pollution in 1861, 1862 and 1863, was sanctioned by prescription. Such a pre-

[McCallum *v.* Germantown Water Co.]

scription to render running water unfit for drinking and domestic purposes by a riparian proprietor below you, requires the strictest proof of its existence.   The rule is a universal one, that no man has a right so to use or apply water flowing through his lands, as to foul the same, or render it corrupt or unhealthy, and unfit to be used by the landowner on the stream below him for domestic purposes.   "It is a principle," says Judge Rogers, "of the common law, that the erection of anything in the upper part of a stream of water, which poisons, corrupts, or renders it offensive and unwholesome, is actionable, and this principle not only stands with reason, but it is supported by unquestionable authority, ancient and modern."   "The maxim is, '*sic utere tuo ut non lædas alienum.*'"   "The general rule of law is, that every man has a right to have the advantage of a flow of water in his own land without diminution or alteration in quantity or quality."  "The use of it must be such as not to be injurious to the other proprietors."   "Each riparian owner has a right to a reasonable use of the stream, which of course will be judged with a regard to public convenience and the general good.   It has been said that this doctrine may prove injurious to the manufacturing establishments which are rising so rapidly in this country.   I do not think so ; but if it does, that is no reason why private rights should be infringed, although it may be a strong reason for legislative interference, in providing a mode by which compensation may be allowed to those whose rights may be affected by an establishment in which the public may be interested :" Howell *v.* McCoy, 3 Rawle 269.

If, therefore, an upper riparian proprietor claims the right to pollute the stream by prescription or a user of twenty-one years, by an analogy to the Statute of Limitations, he cannot pollute the water to any greater extent than it was polluted at the commencement of the twenty-one years.   That is to say, if the pollution at that period was slight or not injurious to any extent, he cannot, at any time within that period, increase it five or tenfold, so as entirely to destroy the water for drinking and domestic purposes.   The right must be measured by the enjoyment, and it gives no right to use it in a different and more extensive manner.

The real defence of the defendant, as appears by his answer and the testimony produced on his behalf, is that he had a prescriptive right, gained by uninterrupted user, to pollute Crab creek in the manner and to the extent complained of in the years 1861, 1862 and 1863.   The preliminary injunction was granted on the 16th February 1863, and the security approved on the 14th November.   The answer was filed on the 16th January 1864, and the replication on the 29th of the same month, and on the 13th February, on motion of the defendant's counsel, an examiner was appointed, who made his report on the 6th October

1865, and on the 30th December, in the same year, the final decree was entered, making the injunction perpetual, after a most careful and deliberate consideration of the whole case.

There appears originally to have been an old oil-mill, which Mr. Clemens, in the war of 1812, tore down, and built a stone factory, which is still there—additions having been made to it. As soon as Mr. Clemens built the mill and got in the machinery, he commenced manufacturing woollen goods. On the 24th September 1825, William Jones purchased the property from Mr. Clemens, and carried on the same business, until he reconveyed it to Mr. Clemens, on the 22d July 1828. From that period until the purchase by Andrew McCallum, on the 18th November 1831, the same business of woollen manufacturing was carried on by Clemens or other persons occupying the factory. Mr. Jones manufactured woollen flannels, woollen yarns, and satinets, and he discharged the refuse water into Paper Mill run. He used the water and horse power to run the mill, but on account of the scarcity of the water in the run he could not do work enough to make it pay.

After Mr. McCallum's purchase, he and his partners continued the making rugs, and introduced carpet making, and the mill was used as a carpet-mill until 1861, and druggets, blankets, flannels and staircloths were made, when they thought they could do so to advantage. After 1830, considerable additions were made to the buildings, and also additions and improvements to the machinery, from time to time until 1856. The steam-engine for driving machinery was put there in 1835, and an addition to the mill was built in the same year, which was used for the engine, boiler and dye-house. Since 1835 improvements were introduced into the factory, which caused a great deal less impurities to go down into the stream.

In 1837, a frame building was put up for weaving purposes. In 1845, having part of their business on Cresham run and Paper Mill run, they built a large addition to the factory on Paper Mill run, for the purpose of concentrating their work, and they put the machinery at Cresham run with the machinery at Paper Mill run into the same factory. At this time there had been but two additions to their dye-house, and they went on gradually increasing their business until 1853. In 1858, 1859 and 1860 there was additional machinery put in, and alterations made to increase the power. In the fall of 1861 they commenced the blanket business, the carpet business at the time being dull, and from September 1861 to May 1862, they ran night and day, making blankets for the army—starting two sets of hands for that purpose—and they left off in May 1862, the business then being dull, and, taking advantage of this lull, they put in another boiler, thereby being enabled to carry on their work with less pressure. In the fall

4 P. F. Smith—4

[McCallum *v.* Germantown Water Co.]

of 1862 they commenced the manufacture of blankets again. Up to May 1862, the mill was run to its fullest capacity. Since the fall of 1862 they were running on blankets, sometimes full and sometimes slack. Blankets are woven in the grease and scoured in the web, and in scouring they use soda ash and soap. The blankets were made for the army under two contracts, the first beginning in September 1861, and the second in September 1862, when they recommenced making army blankets under a contract directly with the United States.

The analysis by Professor Booth and Mr. Huston, in 1852, shows the water to have been pure and fit for drinking, although not so good as the Schuylkill. The analysis in December 1862, by Mr. Garrett, a partner of Professor Booth, shows a very large increase of organic matter contained in the water of the Germantown Waterworks, which he considered exceedingly objectionable. " I would say decidedly objectionable ; I like that word better. I have the Germantown water introduced into my house, and during the summer and fall of the year in which the analysis was made, it was not fit for any household purpose." " If the water stood over night it formed a dark sediment, and had an offensive odor." " A few weeks after the injunction was granted the water improved, and I have been using it ever since."

Dr. Leidy, in speaking of his examinations of the stream, says : " At all times, below McCallum's factory, the sides of the creek presented a large accumulation of bluish-black and reddish filth derived from the factory operations. This filth consists of hairs or wool, colored and uncolored ; filaments of cotton, colored and uncolored ; particles of dye stuffs, undissolved, and amorphous granular matter. From the factory, along the creek to its termination, in the large pool of the Germantown Waterworks, the sides and bottom are covered with a copious iron-gray or dirty bluish tenacious slime, which evidently has its origin in the operations of McCallum's factory, as it contains similar ingredients to the filth just mentioned ; and it forms the nidus of a profuse growth of nycodermatous filaments or mould, such as is constantly produced on decaying animal and vegetable matters. The same slimy sediment covers the rocks composing the dams of the upper and lower pools, accumulates at the bottom of the latter, and is also seen adherent to the surface of the overshoot at the outlet of the main pool."

" The colored water of the creek below McCallum's, and that of the pools, has an unpleasant, feeble taste and odor, recalling to mind the rancid greasy smell so common in factories generally. The same smell and taste was perceived in the water supplied by the Germantown Water Company to the residence of a friend living in Germantown."

" Water from the creek below McCallum's, or from the pools,

[McCallum *v.* Germantown Water Co.]

together with a portion of the bluish slime, kept a few days in glass vessels, undergoes decomposition and emits a powerfully putrescent odor, readily accounted for from the putrefactions of dyestuffs, hair or wool, together with other animal and vegetable particles.  No trace of the bluish slime was discoverable on the creek above McCallum's factory, nor in any of the tributaries of the creek below the latter."

The evidence of Mr. Potter as to the former pure state of the water prior to 1861, is very strong, and his account of the change in the fall of that year corresponds with Dr. Leidy's.  "It was a continuous flow with very little cessation.  When the discharges (of the refuse matter from the mill) commenced, they continued for the best part of twenty-four hours."

The hot water was much more offensive than the cold, "having a smell more of an animal nature, and so very objectionable that few consumers used it either for washing or bathing purposes."

"In the fall and summer of 1862, we received the discharge with increased fury, Mr. McCallum having in the mean time erected additional machinery.  In the spring there had been a lull."  From the fall of 1862 it continued until the injunction, which is conclusive proof that the whole pollution of the water was caused by the operations of the defendant's factory.

Previous to 1861, the water was fit for drinking and all domestic purposes, and every precaution had been adopted at the works of the company to exclude all impurities.  There was, therefore, no right gained by user to pollute the water, so as to unfit it for drinking, before that period ; the actual pollution afterwards is unprotected by prescription, and was simply both a public and a private nuisance.  This is the true view, as appears by the large number of consumers, who never would have taken it if it had been unfit for drinking and domestic purposes.

Chief Justice Erle says, in Smith *v.* Thackerah, 35 L. J. N. S. Com. Pleas, p. 276 : " Where there is an actionable wrong, such for instance, as a person stepping on another man's land, or a returning officer refusing a vote tendered to him, or an interference with the flow of water to which a man is entitled, it is not necessary to prove pecuniary damage."  But in this case there is an interference with a flow of water affecting vitally a whole community, and particularly in the advent of cholera, which may be caused, and will be certainly aggravated by the use of foul or impure water.

This subject of the impurity of the water furnished to the citizens of the old Kensington district, from the river Delaware, was, a short time ago, under discussion in the City Councils, and it was distinctly stated that it was the procuring cause of cholera and other diseases, which were alarmingly prevailing in those sections where the impure water is used.

In a very able article in the Edinburgh Review of April last, headed "Water Supply," discussing the means of supplying the metropolis and seventeen northern manufacturing towns with unexceptionable water, the effect of impure water in producing cholera is stated in very strong language, making the following extract from the Report of the Committee of the Board of Health during the cholera epidemic in London in 1853–4:—

"The present state of scientfic knowledge does not justify dogmatic assertions on this subject; but there are many reasons for believing in respect not only of cholera, but of many kindred diseases, that the means and agencies of morbid infection stand in intimate relation to decaying animal products, within and without the body, and the slightest taint of organic decomposition, within the drinking-water of a large population, therefore constitutes a danger which we cannot but regard with as much alarm as disgust." The reviewer says: "No evidence of the truth of such views could be more convincing than that which was derived from the facts relating to the visitation of cholera in London in 1853–4, when it was clearly ascertained that a very large population drinking foul water, suffered from the epidemic more than three times as much as a similar population drinking cleaner water." After giving the particular facts, he continues: "In effect, then, the drinkers of foul water suffered three and a half times as much mortality as the drinkers of superior water." And the commissioners appointed to inquire into the best means of preventing the pollution of rivers, in their report of 1865 on the river Thames, use this language: "The result seems to be that as a water supply, the Thames, polluted with the sewage of the inhabitants of the river basin, is open in kind, if not in degree, to the same objections as well-water infiltrated by liquid from an adjoining cesspool." And in the November number of the Law Magazine and Law Review, in an article on public health, p. 99, the writer says: "Let not that which should be God's choicest gift and health-giver, pure water, be by man's imperfect meddling converted into a source of poison and of death, of desolated homes and destitute orphanage."

To give, therefore, a supply of pure water to London and its 3,500,000 inhabitants, it is proposed to supply 200,000,000 gallons per day of unexceptionable water from the flanks of the mountain ranges of Cader Idris and Plynlimmon, in North Wales, from which the river Severn is supplied, and to supply the seventeen northern manufacturing towns from the lake districts of Cumberland and Westmoreland, with water of the same character.

The subject of the pollution of rivers and streams is attracting great attention in England, and very important cases in relation to it have been before the English courts, the most striking and instructive of which is Goldsmid *v.* The Tunbridge Wells Improve-

ment Commissioners, decided by the Master of the Rolls, on the 24th November 1865 (35 L. J. N. S. Ch. 88), and affirmed on appeal by the Lords Justices, on the 24th March 1866 (Id. 382), and in 12 Jurist, N. S. 308, where the report is fuller.

In this case, a brook into which a considerable part of the sewage of Tunbridge Wells was discharged, flowed through the plaintiff's land, entering it at a distance of about one and a half miles from the town, and leaving it about four miles from the town. The evidence showed that at some time (not clearly defined), the water had been fit to drink; that it was no longer so; and that the deterioration was owing to the sewage from Tunbridge; and the Master of the Rolls held that the plaintiff was entitled to an injunction to restrain the defendants, who had the entire control of the sewage from Tunbridge Wells, from allowing any sewage to flow into the brook so as injuriously to affect the waters on the plaintiff's land, although the sewage there did not as yet amount to an absolute nuisance.

"I am of opinion," said Sir John, now Lord Romilly, "that it is impossible for any one to read this evidence and not to come to the conclusion, first, that the property of the plaintiff is seriously injured by the pollution of the stream. Secondly, that this pollution is occasioned by the sewage discharged from Tunbridge Wells into the brook; and thirdly, that it has been of slow and gradual growth, that it has increased, and is now increasing, and that in process of time the stream will become an absolute nuisance to all those who reside on its banks, or who reside in the immediate vicinity of it."

In speaking of the gradual increase of pollution, the learned judge said: "If he comes to court and complains very early, then the evidence is that it is not perceptible, it is wholly inappreciable, and you get evidence after evidence for the defendant (though there may be only a very slight pollution, and perhaps only observable at some times and on some occasions), saying, 'You have no proof at all that there is any appreciable pollution, and you must wait until it becomes a nuisance.' Then he waits for five or six years, until it is obvious to everybody's sense that the pollution is considerable, and then they say, 'You have come too late; you have allowed this to go on for twenty years, and we have acquired an easement over your property, and a right of pouring the sewage into it.' My opinion is, that any person who has a watercourse flowing through his land, and sewage which is perceptible is brought into that watercourse, has a right to come here and stop it; and that where the pollution is increasing, and gradually increasing from time to time by the additional quantity of sewage poured into it, the persons who allow the polluted matter to flow into the stream are not at liberty to claim any right or prescription against him.

[McCallum *v.* Germantown Water Co.]

" Although in this case I have only to consider an injury to a private individual, yet I believe the injury to the public may be extremely great by polluting a stream, the water of which cattle are in the habit of drinking, which persons who reside on the banks must necessarily inhale from time to time, and this at a time when the attention of the public and the court (although it is not given in evidence) is necessarily called to the fact that the most scientific men who have examined the subject, are unable to say whether great diseases among cattle, and great contagious diseases affecting human beings, such as cholera, typhus, and the like, may not in a great measure be communicated or aggravated by the absorption of particles of feculent matter into the system, which are either inappreciable or scarcely appreciable by the most minute chemical analysis. It is impossible, in that state of things, to say what amount of injury may be done by polluting even partially, a stream which flows through a considerable distance." After speaking of the removal of the pollution, he says, " That that is feasible, and is easily attainable by ordinary means and little expense, the court has found in many cases, and then the sewage becomes an advantage instead of being a nuisance."

In the court of appeal, the prescriptive right was laid aside by the court, and it was of opinion that it was a nuisance, and also a prospective nuisance of a permanent character. " The defendants, also," said Lord Justice Turner, " relied much upon the case of Elmshirst *v.* Spencer, 2 Mac. & G. 45 ; but that case seems to be quite distinguishable from the present. As I understand it, the court was of opinion that there having been no trial at law which was necessary, according to the then course of the court, the nuisance was not established ; and further, that no injury was proved ; but, in this case, I think there is proof both of the nuisance and of the injury."

The case of Elmshirst *v.* Spencer was decided in 1849, and the syllabus, which is a fair representation of the decision of Lord Cottenham, is in these words : " A court of equity will not exercise its jurisdiction by injunction at the instance of an individual against an alleged nuisance without a previous trial at law, *or without its being clearly proved that the plaintiff has sustained such substantial injury as would have entitled him to a verdict for damages in a court of law.*" The last clause using the very language of the Lord Chancellor in a condensed form.

By the Act of 15 & 16 Vict. c. 86, to amend the practice and course of proceeding in the High Court of Chancery, passed the 1st July 1852, it was made unlawful for the court in any cause or matter to direct a case for the opinion of any court of common law, but the said court·shall have full power to determine any questions of law, which in the judgment of the said Court of Chancery shall be necessary to be decided previously to the deci-

[McCallum v. Germantown Water Co.]

sion of the equitable question at issue between the parties; and the 62d section allowed the court in cases where according to the then practice of the Court of Chancery such court declines to grant equitable relief until the legal title or right of the party or parties seeking such relief shall have been established in a proceeding at law, the said court may itself determine such title or right without requiring the parties to proceed at law to establish the same : 3 Chitty's Collection of Statutes, pp. 897, 898.

By the Act of 14 & 15 Vict. c. 83 (7 August 1851), establishing the Court of Appeal, it was provided that the Lords Justices, Master of the Rolls, and the Vice-Chancellors might sit with the assistance of a common-law judge upon the request of the Lord Chancellor (Id. 874), and by the Act of 21 & 22 Vict. c. 27 (28 June 1858), cited as " The Chancery Amendment Act 1858," the court were allowed to assess damages in cases of injunction, and specific performance either in addition to, or in substitution for such injunction, or specific performance, and such damages may be assessed in such manner as the court shall direct, and the court are authorized to cause them to be assessed, or any question of fact arising in any suit or proceeding to be tried by a special or common jury before the court itself (Id. 916), and by the 5th section the court may try these questions of fact and assess the damages before the court itself without a jury (Id. 917).

By the Chancery Regulation Act 1862, 25 & 26 Vict. c. 42 (17 July 1862), it is enacted that " in all cases in which any relief or remedy within the jurisdiction of the said Courts of Chancery respectively, is or shall be sought in any cause or matter instituted or pending in either of the said courts, and whether the title to such relief or remedy be or be not incident to or dependent upon a legal right, every question of law or facts cognisable in a court of common law, on the determination of which the title to such relief or remedy depends, shall be determined by or before the same court:" Id. 921.

The Lords Justices, on appeal from V. C. Stuart on 4th December 1862, held, that the Court of Chancery can no longer send a case to be tried at law: Re Hooper's Estate, 32 L. J. N. S. Ch. 55; s. c., 7 L. T. N. S. 843.    On the 31st January 1859, immediately after the passage of the Chancery Amendment Act 1858, the Master of the Rolls held, in cases requiring a jury under it, the practice of the court in granting issues would be followed.    Before the hearing, the court will not summon a jury without the consent of the defendant.

" It would be necessary," said the Master of the Rolls, " to hear the case upon the evidence to determine whether it would be necessary to require the assistance of a jury.    There must be a ground for the application; it cannot be made ex parte.    The 21 & 22 Vict. c. 27, has enabled the court to do by a jury what

[McCallum *v.* Germantown Water Co.]

it formerly did by issue. The practice, therefore, of the court, in granting issues, must be followed. Then, after answer, if counsel on both sides state that the facts are so complicated or that the testimony is so conflicting that it would be impossible satisfactorily to decide the question without an issue, the court will immediately make the order:" George *v.* Whitmore, 28 L. J. R. N. S., Ch. 720.

"We suppose it well established as a rule of Chancery," says Chief Justice Shaw, "that on a hearing an issue to try a matter of fact will be ordered or not, according to the sound judicial discretion of the court:" Ward *v.* Hill, 4 Gray 595; see, also, Crittenden *v.* Field, 8 Gray 626.

"In a controversy about matter of fact the Court of Chancery, if it have jurisdiction, may direct an issue to try the fact by a jury, although a verdict is not, perhaps, indispensable, *and the Court might, itself, find the fact*. The court directs an issue for the better information of its conscience. If fully satisfied as to the evidence, they will not send it to a trial at law:" per Parker, C. J., in Tappan *v.* Evans, 11 N. Hamp. 311. In Black *v.* Lamb, 1 Beasley (N. J.) Ch. 113, Chancellor Williamson said: "Certainly no appeal would lie from an order of the court directing an issue, or for refusing one on the application of either party." The whole is a matter of judicial discretion, and the tendency of modern times is opposed to the increased length of litigation caused by the practice of directing issues: Bassel *v.* Johnson, 2 Green Ch. R. 417, 1836; 2 Daniell's Ch. P. 1086; Perkins, 3d Am. Ed., 1865.

Notwithstanding the evident policy of a court, when it once obtains jurisdiction of any cause, dealing with the whole matter by its own power and by judicial machinery belonging to itself exclusively, the equity bar in England resisted to the utmost the introduction of trial by jury into the Court of Chancery. This opposition grew out of the entire division and separation of the English barristers into two distinct professions, the common-law bar and the equity bar. The latter were entirely ignorant of the practice in trials by jury, and particularly in the *viva voce* examination and cross-examination of witnesses in open court, a branch of the practice requiring a thorough schooling and great practical skill and acuteness. A strong example of this occurred in the trial of the Directors of the British Bank, when the Attorney-General, Sir Richard Bethell (now Lord Westbury), the acknowledged leader of the equity bar, substituted Sir Frederick Thesiger, of the common-law bar, to perform a duty which devolved on him as representing the Crown in all criminal cases. This case was a remarkable one, as a change of ministry occurred during the trial, and Sir Frederick being appointed Lord Chancellor and

[McCallum v. Germantown Water Co.]

a peer of the realm, by the title of Lord Chelmsford, was, of course, obliged to return his brief and his fees.

The unwillingness of the equity bar, and perhaps of the equity judges, unaccustomed to trials by jury, which, when issues were directed to a common-law court, were tried by a common-law judge and a common-law bar, no doubt caused "The Chancery Regulation Act, 1862," and the preamble to it is strong evidence of the necessity of forcing the Court of Chancery finally to dispose of all its own litigation within its own walls.

"Whereas," says the preamble, "the High Court of Chancery has power in certain cases to refuse or postpone the application of remedies within its jurisdiction, until questions of law or fact on which the title to such remedy depends have been determined or ascertained in one of Her Majesty's courts of common law; and whereas, it is expedient that the said power should no longer exist, and that in all such cases every question of law and of fact cognisable in a court of common law, arising in the said Court of Chancery, on which the right of any party to any relief or remedy depends, and whether the title to such relief be or be not incident to or dependent upon a legal right, should be determined by or before the said court itself," which was then followed by the first section above quoted.

The very able opinion of Lord Westbury in Fernie v. Young, in the House of Lords, on the 24th of April last, 14 Law Times Rep. N. S. 637, gives a very succinct but satisfactory view of the old practice of the Court of Chancery in such cases, and the effect of the Acts of 1858 and 1862 in abolishing it, and obliging the court to decide all questions of law and fact, without referring either one or the other to any other tribunal.

The case of Holsman v. The Boiling Spring Bleaching Company, decided at May Term 1862, by Chancellor Green, and reported,1 McCarter's Chancery Rep. N. J. 335, in a case on all fours with the one before us, shows the settled practice of the Court of Chancery of New Jersey in such cases.

The injunction asked for, and granted on final hearing, was to restrain the defendants from polluting a stream of water which ran through the plaintiff's land, by emptying into it the chemicals and other noxious substances used by the defendants in their bleaching operations.

"Every owner of land," said the Chancellor, "through which a stream of water flows, is entitled to the use and enjoyment of the water, and to have the same flow in its natural and accustomed course without obstruction, diversion or *corruption*. The right extends to the *quality* as well as the quantity of the water. The Court of Chancery has a concurrent jurisdiction with courts of law, by injunction, equally clear and well established in cases of private nuisances, and it is a familiar exercise of the power of

[McCallum *v.* Germantown Water Co.]

the court to prevent, by injunction, injuries to watercourses by obstruction or diversion."

"A disturbance or deprivation of that right" [to the use and enjoyment of the water in its natural state], "is an irreparable injury, for which an injunction will issue."

"Where the nuisance operates to destroy health, or to diminish the comfort of a dwelling, an action at law furnishes no adequate remedy, and the party injured is entitled to protection by injunction."

"It is urged that the right of the complainant is not clear, and must therefore be fully established at law before an injunction will issue. Where the complainant seeks protection in the enjoyment of a natural watercourse on his land, the right will ordinarily be regarded as clear; and the mere fact that the defendant denies the right by his answer, or sets up title in himself, will not entitle him to an issue before the allowance of an injunction."

After stating the claim of right to pollute the stream as far back as 1814, by the establishing a mill on defendant's premises, used for fulling, dyeing and sawing, the Chancellor continues, "But admitting the fact to be clearly established that a fulling and dyeing-mill and saw-mill were upon the premises as early as 1814, and were continuously used for twenty years, it does not sustain the claim of an adverse right set up by the defendants. The nuisance complained of is not the existence of the mill, nor its immediate operation. The mill, as at present used, is not driven by the water of the stream. Its motive power is steam. The complaint is, that chemicals and other foreign and offensive matter is discharged into the stream, at the defendant's works, of such character and in such quantity as to render the water of the stream on the lands of the complainant unfit for household uses, and for other purposes to which it was applied by the complainant. The existence of the defendant's mill, or the discharge of dyeing materials or drugs into the stream on the defendant's lands, constitutes no injury to the complainants if their usufructuary right to the stream is not interfered with. The defendants have a right to use the water upon their own soil in such manner as they may deem for their interest, provided they discharge it upon the soil of the complainants, in its accustomed channel, pure and unpolluted. They can, therefore, acquire no right by prescription until they show that the acts which are claimed to constitute the adverse user, injured the complainants and gave to them, or those under whom they claim title, a right of action. The very ground of title, by adverse enjoyment, is that the party against whom it is set up has so long permitted the adverse enjoyment, and failed to vindicate his rights, that the presumption of a grant is raised. But there can be no such presumption, and, con-

[McCallum *v.* Germantown Water Co.]

sequently, no title by adverse enjoyment, where no violation of a right is shown to exist.   Thus, where an action is brought for overflowing the plaintiff's land by backwater from the defendants' mill-dam, it establishes no title by adverse enjoyment to prove that the defendant's mill has been in existence over twenty years, or that the dam has been in existence for that period.   The question is not how high the dam is, but how high the water has been held, whether it has been held for twenty years so high as to affect the land of the plaintiff as injuriously as it did at the time of the action brought.

" To prove, therefore, that there was a fulling and dyeing-mill or other manufactory for twenty years on the defendants' land, and that they discharged drugs and dye-stuffs into the stream during that period, proves nothing, unless it is shown that the materials discharged into the stream were of such character and of such an amount as to pollute the waters which flowed upon the complainants' land and rendered it unfit for use.   If the evidence stops short of that, it proves no adverse enjoyment in the defendants or those under whom they claim.   I find no such evidence in the cause.

" Again, it is a familiar principle as applied to the doctrine of adverse enjoyment, that the right acquired must be commensurate with the extent of the enjoyment.   The extent of the right is to be measured and regulated by the extent of the enjoyment upon which the right is founded."   " The right acquired must be commensurate in *character* and *extent* with the enjoyment."

" Looking alone to the legal rights of these parties and to the well-settled principles of courts of equity in the exercise of its protective powers for the maintenance of those rights, I think the complainants are entitled to an injunction."

I have made these large extracts from this very valuable opinion of Chancellor Green, because they apply so directly to the present case, and dispense entirely with any labored vindication of the action of the court below, which is one of both law and equity, presided over by the same judges, who of course are competent to decide any question of law, and who, if they deemed an issue to try a fact necessary, would be the tribunal to try it.

The judges of the Court of Common Pleas being judges both in common law and equity, and the same being true of the judges of the Supreme Court, whether sitting in banc or at Nisi Prius, who have remodelled their equity rules upon the improved practice of the English Court of Chancery, there can be no reason, in a plain case like the present, where there is no actual dispute either of law or fact, why it should not be finally decided by this tribunal upon the case before them.

I have gone over the whole ground and examined the stream

[McCallum *v.* Germantown Water Co.]

and the works for my own satisfaction, and am entirely satisfied that the whole of the pollution of the stream proceeds from the discharge of foul matter into it from McCallum's factory.

| | |
|---|---|
| The dam and works are situated in a romantic and sequestered dell, and the distance from them to the stand-pipe is . . . . . . | 1203 feet. |
| Height of the bottom of stand-pipe above surface of dam at engine-house, . . . . | 131 " |
| Distance from the stand-pipe to the reservoirs at Mt. Airy, . . . . . . . | 11,535 " |
| Height of water in stand-pipe above bottom, . | 123 " |
| Head of water on reservoirs from stand-pipe, . | 25 " |
| Diameter of main from works to the stand-pipe, | 10 inches. |
| Diameter of main from stand-pipe to the reservoirs, . . . . . . . . | 10 " |
| Diameter of distributing main from the reservoirs, . . . . . . . | 10 or 12 " |

These are the works which the court below have protected by a perpetual injunction.

> Decree affirmed and appeal dismissed at the costs of the appellant.