Commonwealth of Pennsylvania ex rel. Henry C. McCormick, Attorney General, and The Butler Water Company, Appellants, *v.* A. J. Russell, Charles A. McNally, James Patton and John Henry.

[Marked to be reported.]

*Water Companies—Public use.*

The furnishing of water to the public is like the furnishing of light and heat, a public use.

*Eminent domain—Visitorial powers—Water company—Parties.*

To enable it to discharge its duties to the public a water company is clothed with the right of eminent domain ; and to secure to the public faithful service, it is subject to the visitorial powers of the state.

The commonwealth was regularly on the record in this case as a party plaintiff, and it was error to dismiss the bill without considering the questions raised on her behalf.

These questions were three in number : First, To what extent does the public use served by the Water Company place it on higher ground than that of a private person or corporation serving a private use ? Sec-

ond, Does a city with its thousands of inhabitants, and its duty to protect them in the enjoyment of the necessaries of life and the preservation of health, stand on no higher ground than a private citizen so far as the protection of its water supply from pollution is concerned? Third, May not the commonwealth rightfully interfere in such a case in the exercise of its police power?

Argued Oct. 24, 1895.   Appeal, No. 251, Oct. T., 1895, by plaintiffs, from decree of C. P. Butler Co., March T., 1895, No. 4, on bill in equity.   Before STERRETT, C. J., GREEN, WILLIAMS, MCCOLLUM, MITCHELL, DEAN and FELL, JJ.   Reversed.

Bill in equity filed by the plaintiffs against defendants to restrain them from pumping salt water into the Connoquenessing creek, and thereby polluting it above where the Butler Water Works takes its supply of water for the purposes of the borough of Butler.

The case was heard on bill, answer and proofs.   GREER, P. J., found the facts to be as follows:

1. The inhabitants of the borough of Butler, since 1878, have been principally supplied with water for sewer, fire, motor and domestic purposes by the Butler Water Company, a corporation organized under the general corporation act of 1874, for the purpose of supplying pure water to the inhabitants of said borough and for that purpose the said water company has, upon land owned by it upon the Connoquenessing creek, erected a dam and from thence has pumped the water of said creek into its reservoir, and from thence has carried the water by means of mains and pipes laid by it through the streets, lanes and alleys of the said borough to the residences, offices and places of business of a large number of inhabitants of said borough at a large expense, and the said inhabitants of said borough have also at a large expense introduced the said water of the said Connoquenessing creeks into their residences, offices and places of business and have been using the said water.

2. That about February 1, 1895, the defendants commenced to pump a deep well on the water shed of the Connoquenessing creek above the dam of the Butler Water Company, from which the inhabitants of the borough of Butler are supplied with water; that since then the defendants have drilled another deep well upon the same watershed also above the said dam;

that from about February 1, 1895, the defendants or those claiming under them, who have purchased interests in said wells since the answer in this case was filed on March 2, 1895, have been pumping salt water from one or both of said deep wells and permitting the same to run upon the ground and follow its way to the Connoquenessing creek at a point above the dam öf the said Butler Water Company in large quantities, to wit, near two thousand barrels per day, and are still continuing to pump the same, together with the others who are independently also pumping salt water in said stream, pour out in said stream from five to ten thousand barrels of salt water per day, and to such an extent that the water of said creek at the dam of said water company has contained as high as about one thousand grains of salt per gallon of water.

3. That the water of said creek as it was furnished by said water company to the inhabitants of the borough of Butler prior to the time the defendants began to pump salt water and allow it to run into the creek was fit and proper water to be used for boilers and was used for that purpose by the different railway companies in the town, patrons of the Butler Water Company, and by manufacturing establishments, also patrons of said company, and during nine or ten months in the year was also wholesome water and fit for domestic use and was so used by many hundreds of patrons of the said Butler Water Company for many years, to wit, since the year 1878.

4. That the oil and salt water are so mixed and mingled under the ground that they must be pumped out together and separated after reaching the surface; that there is no machinery or way known to the business of producing oil that will separate the same before reaching the surface; that after being pumped into tanks on top of the ground, the salt water sinks, leaving the oil on top, the salt water is poured out upon the ground and by gravity is forced into the streams which lead to Connoquenessing creek; that there is no way known to the business by which this salt water can be consumed, destroyed, evaporated or impounded, so as to prevent its obeying the laws of gravitation and seeking the stream of the Connoquenessing creek by way of the tributaries leading from the land on which it is produced to said creek.

5. That the pollution of the waters of the Connoquenessing creek by the defendants and by others claiming under them

since the filing of the answer in this case and by others engaged in also polluting said stream by the said means and acting independently of the defendants, began about February 1, 1895, and the said pollution, as increased by the defendants or those claiming under them, by which the destruction of the pipes of the Butler Water Company is threatened and by which they have lost many patrons and are threatened with much more loss of income and otherwise which may render their plant almost useless or at least greatly reduced in value.

6. That the pollution of the waters of the said Connoquenessing creek is increased by the defendants or those claiming under them since the answer was filed in this case by pumping salt water and oil from the wells owned and operated by the defendants into tanks where the same were separated and the salt water permitted to flow upon the ground, from whence it reached the creek and began to so pollute the said stream about February 1, 1895, by which the inhabitants of the borough of Butler as supplied by the Butler Water Company, have been deprived and are now being deprived most of the year of wholesome water for drinking, washing and cooking purposes.

7. That the sole and only water supply sought to be utilized by the Butler Water Company prior to the beginning of this action was the Connoquenessing creek.

8. The said creek and its tributaries are the natural channels into which the salt water produced by defendants in their oil operations flows, and by which it is carried away.

9. That prior to the beginning of this action, and prior to the time defendants began operating for oil and doing the acts complained of by plaintiff, a large number of the citizens of Butler, to wit, some one hundred and seventy-four, had begun proceedings in this court against said plaintiff company, complaining that the water being supplied by said company from the Connoquenessing creek was insufficient in quantity, bad in quality and unfit for domestic use.

10. That the water supply furnished by said creek is not inadequate to meet the wants of the inhabitants of Butler, and that prior to the committing by defendants of the acts complained of the water furnished by said plaintiff company from said creek, for some months of each year for several years last past, was foul and filthy in quality, unwholesome and unfit for domestic use.

11. That the plaintiff company can, at a reasonable cost and expense, supply the inhabitants of said borough with a full and adequate supply of wholesome water from sources outside and independent of said creek.

12. The plaintiff company by laying a line to the Connoquenessing creek above the point where the salt water reaches it, can there procure as large a supply of water in the summer months as at the point where its plant is located and of as good quality as the said creek will afford, and the water supply for said town being a constant and known quantity, it would be more practical and less expensive for said company to do so than for defendants to collect and care for the salt water, which is an unknown quantity, uncertain in amount.

13. That the defendants are engaged in a legitimate business, which they are conducting in a legal manner, without malice or negligence, and at the only place where said business can be carried on, and it is not through any neglect on the part of the defendants or their employees that the salt water finds its way from their wells into said creek.

14. That prior to the time the plaintiff company began using said creek as a water supply, the watershed of said stream was being operated for oil and had produced oil in large quantities, whereby the water of said stream was for some time contaminated by the drainage from the wells then drilled on said watershed.

15. That the business of producing oil in Butler county has been of great benefit to the citizens thereof and millions of dollars' worth of oil, estimated at from fifty to seventy-five million dollars' worth, have been produced within her borders, and the said business cannot be carried on without in a greater or less degree contaminating and rendering unfit for domestic use the waters of the streams in the watersheds so operated.

16. The town of Butler, within a period of about ten years last past, has grown in proportion from a little more that three thousand to about ten thousand inhabitants, which increase was largely induced by reason of oil developments within Butler county.

17. At and prior to the time the Butler Water Company established its plant and began supplying water to the inhabitants of said borough it was a fact of public notoriety, well known in the community, that the business of operating for oil

was one of the principal industries of Butler county, and that the watershed of said creek had been and was still being operated for oil.

18. That the salt water produced by defendants and others, which has flowed into the Connoquenessing creek is not unwholesome in itself and has not produced any injurious effects on the general health of the borough of Butler.

19. That the said defendants and others operating for oil in the same vicinity, on the watershed of the Connoquenessing creek, in what is known as the "hundred-foot" district thereof, are the owners of large bodies of leases for oil purposes, aggregating several thousand acres, and have already invested large sums of money, estimated at $175,000, for the purpose of developing the same for oil from the "hundred-foot" sand or oil bearing rock.

20. The defendants and said other persons are developing said territory and operating thereon in the usual and ordinary manner of developing and operating "hundred-foot" territory.

21. There is no known method by which the oil can be produced and pumped from the "hundred-foot" sand or oil bearing rock without, at the same time and with the oil, producing and pumping to the surface the salt water contained in said sand or oil bearing rock.

22. That it is impracticable for the defendants and others operating and developing said hundred-foot territory to care for the salt water necessarily produced at any reasonable cost or expense, and to require them to do so would be in effect to prohibit the production of oil in that field.

23. That neither the defendants in this bill or others operating in the same territory are invested with the right of eminent domain, and have no right to enter upon or cross the lands of other persons for the purpose of piping away the salt water produced by them to a point below plaintiff company's plant, which fact, in the absence of the consent of the intervening landowners renders their doing so a legal impossibility.

24. Even if the defendants had the right of eminent domain, yet the uncertain and ever-increasing amount of salt water to be taken care of would render it impracticable so to do, inasmuch as any pipe line constructed for that purpose would have to be of sufficient capacity to accommodate the prospective increase of salt water from the unknown number of wells that may yet be

drilled, and the salt water would require to be collected by lateral lines over a large extent of territory to each producing well, and carried in this way to the common conduit, and this, in turn, would require the joint, harmonious and voluntary action of all the producers, both present and prospective, in that territory, and would have to be carried to a point at the mouth of the Beaver river on the Ohio, or farther, to prevent like complaint from other parties living between that place and the dam.

25. Even if the salt water were being taken care of and could be taken care of in some practicable way, yet the unavoidable leakage from the pipe line conducting the same away, together with the necessary washings from about the wells, would of itself be sufficient to contaminate the waters of said creek.

26. The defendants, in carrying on their business of operating, producing and developing for oil, are doing so in such a manner as to do the least harm consistent with the natural use of their own property.

27. That the defendants, or those claiming under them since the answer in this case was filed, cannot avoid the hardships inflicted upon the Butler Water Co. and inhabitants of Butler borough, who are consumers of the waters furnished by the said company, without abandoning the use of their property or an outlay of expense which would practically more than counterbalance the expected profit or benefit to be derived from the development for oil purposes of the land on which the wells are situate.

28. The defendants are operating their wells in producing oil from the hundred-foot sand in the ordinary and usual manner, that being only the natural use and enjoyment of their property without negligence or malice. As the operations of the wells increased, the volume of salt water increased, this being emptied upon the ground, flowed by the natural course of gravity into tributaries of the Connoquenessing creek.

29. That the water shed of the Connoquenessing creek, from which the water company has furnished water to the people of Butler, extends some nine or ten miles north or northeast of the borough, and contains about thirteen thousand and eight hundred and eighty acres of land, and in addition to this Bonniebrook, a stream coming from the east, emptying into the Connoquenessing a little ways below the present dam of the

said water company, has a watershed of five thousand one hundred acres.

30. That to enjoin the defendants from pouring out the salt water so raised with the oil from underneath the ground to its surface would be to enjoin them from drilling for and producing their gas and oil, and effectually deprive them of the use and enjoyment of their private property, and be taking and applying it to public or private use without authority of law and without just compensation being first made or secured.

31. That a fair estimated value of the oil as it is located in the hundred-foot under the water shed of the Connoquenessing creek, above the dam of the Butler Water Company, clear of the expenses of drilling for, producing and pumping to the surface, is from one million to ten million dollars; that in addition to this the operations therefor would furnish employment for a large number of drillers, tool dressers, pumpers, mechanics, teamsters and laborers for a long period of time, and would furnish a market for lumber, timber, boilers, engines, hardware, casing, tubing, rods and oil well supplies in general; that the community in and around the town of Butler is suffering no particular inconvenience on account of the pollution of the water of the Connoquenessing, other than being deprived of good, pure, healthful, fresh water, which can and should be furnished them by the Butler Water Company from practical sources, reasonably within its reach, but which it has negligently and deliberately failed to secure, and the public has no other interests greater or more sacred than it has in the safe condition of a roadbed or bridge of one of its leading railroads.

32. That the inhabitants of the borough of Butler can, at a comparatively small and reasonable expense, procure good water to a limited extent for all domestic purposes, by drilling wells on their own premises within the said borough, and many of the inhabitants are so supplying themselves with water at the present time.

33. The bill in equity was originally commenced by the Butler Water Company as plaintiff, upon whose motion the record was amended so as to have the commonwealth of Pennsylvania, ex rel. Henry C. McCormick, attorney general, become a party to the proceeding, and there is nothing else appearing upon the records or in the evidence to show that the

information was brought in behalf of the public, but merely at the relation of the Butler Water Company, a private party who might itself have instituted a suit, if it had sustained any special injury.

The court held that the case was ruled by Sanderson v. The Coal Co., 113 Pa. 126, and entered a decree dismissing the bill.

*Error assigned* among others, was decree dismissing the bill.

*T. C. Campbell* and *John M. Thompson, W. C. Thompson* and *Lev. McQuistion*, with them, for appellants.—No man has a right so to use or apply water flowing through his lands as to foul the same, or render it corrupt and unhealthy, and unfit to be used by the landowner on the stream below him for domestic purposes: Howell v. McCoy, 3 Rawle, 269; McCallum v. Germantown Water Co., 54 Pa. 40; Helfrich v. Cantonsville Water Co., 74 Md. 269.

The case of Pennsylvania Coal Co. v. Sanderson, 113 Pa. 126, established an exception to the abstract rule stated above. Let us concede that, as stated in Collins v. Gas Co., 131 Pa. 143, the Sanderson case, under the facts involved in it, " definitely settled the rule that for unavoidable damage to another's land in the lawful use of one's own, no action can be maintained." After all, what was established there was an exception to the rule, and it was established by the " strongest authority in its favor," as was said in Pfeiffer v. Brown, 165 Pa. 267. The difficulty with which that exception was established in Sanderson v. Coal Co. is the strongest argument we could make against its extension.

This case is another of the numerous attempts which have been made since to extend the reasoning of that case to other facts and circumstances.

The contest then in that case was between a private interest solely, upon the one hand, and a private enterprise which subserved a great public interest upon the other. From the necessities of the case one or the other had to give way, and as matter of policy it was determined in favor of the latter. But here the contest is between the water company, a public or quasi public corporation engaged in supplying the public, and the public represented by the attorney general, upon the one hand, and private interests subserving a public interest upon

the other: Penna. R. R. v. Lippincott, 116 Pa. 472; Robb v. Carnegie, 145 Pa. 339.

The right of the public to take supplies of water from streams is shown by the following cases: Haupt's App., 125 Pa. 211; Phila. v. Commissioners, 7 Pa. 363; Barre Water Co. v. Carnes, 65 Vt. 626; Phila. v. Collins, 68 Pa. 106; Cameron Furnace Co. v. Penna. Canal Co., 2 Pearson, 208; Clark v. Lawrence, 6 Jones Eq. (N. C.) 83; New Boston Coal etc. Co. v. Pottsville Water Co., 54 Pa. 164; New Castle v. Raney, 130 Pa. 546; Philadelphia v. Gilmartin, 71 Pa. 140.

Cases somewhat similar to this have arisen in California in late years, both in the state and federal courts, out of hydraulic gold mining. Under an immense pressure of water the gold-bearing earth and rock is pulverized and the débris is discharged into natural streams below. Enormous quantities of this washed out earth and rock were washed down and filled the valleys, burying farms, threatening towns, and impairing navigation. Upon bills filed for that purpose injunctions were granted restraining such mining, both at the instance of an individual and of the people: People v. Gold Run Co., 66 Cal. 138; Woodruff v. North Bloomfield Gravel Mining Co., 9 Sawyer, 441.

The policy invoked here is the police power of the state: State v. Yopp, 97 North Car. 477.

To bring a case within the exception established by Pennsylvania Coal Co. v. Sanderson, 113 Pa. 126, the damage must be unavoidable. If the injury could be foreseen and could be prevented at reasonable expense an action will lie: Collins v. Gas Co., 131 Pa. 143; Pfeiffer v. Brown, 165 Pa. 267.

The neighboring owner is entitled to the reasonable and comfortable enjoyment of his property, and if his rights in this respect are invaded, he is entitled to the protection of the law, let the consequences be what they may: Susquehanna Fertilizer Co. v. Malone, 73 Md. 268.

*J. M. Galbreath, Clarence Walker, H. McSweeney* and *J. B. McJunkin* with him, for appellees.—While equity has jurisdiction to restrain a public nuisance upon the information of the attorney general, either on behalf of the state or at the relation of an individual, yet injunctions have often been refused when

it appeared that the informations were not brought on behalf of the public, but merely at the relation of private parties, who might themselves have instituted the suit if they had sustained any special injury: 2 Beach on Injunctions, 1078: Huckenstein's App., 70 Pa. 102.

In equity a decree is not of right but of grace, and a chancellor will refuse to enjoin if in conscience it appear he would do greater injury by enjoining than by leaving the party to his redress by a court and jury: Richard's App., 57 Pa. 105; Hough v. Doylestown, 4 Brewster, 333.

When the thing sought to be prohibited is not a nuisance per se, but may, according to the circumstances, prove so, the court will not interfere without a previous trial at law.   Grey v. The Ohio & Penna. R. R., 1 Grant, 412; Rhea v. Forsythe, 37 Pa. 503: New Castle v. Raney, 130 Pa. 546; Mowday v. Moore, 133 Pa. 598; Wood v. McGrath, 150 Pa. 451; 2 Beach on Injunctions, 1060.

The right to the use of a stream of water in its natural purity cannot override other coequal and coexisting rights, it must yield to those of a more absolute and unqualified character: Helfrich v. Cantonsville Water Co., 28 Am. St. Rep. 245; Kauffman v. Griesemer, 26 Pa. 414; Pa. Coal Co. v. Sanderson, 113 Pa. 145.

The right to mine is not a nuisance in itself: Robb v. Carnegie, 145 Pa. 324; Collins v. Chartiers Gas Co., 131 Pa. 143; Williams v. Ladew, 161 Pa. 283; Wheatley v. Baugh, 25 Pa. 528.

OPINION BY Mr. JUSTICE WILLIAMS, January 6, 1896:

This case presents a public question of very grave consequence which does not seem to have been passed upon in the form in which it is now encountered.   A brief statement of the facts by which it is raised will conduce to a readier apprehension of it.   The Butler Water Company is a corporation organized under the general corporation act of 1874 to supply the borough of Butler with water.   It has been carrying on its business for about seventeen years.   The borough of Butler contains at this time a population of about ten thousand and is steadily and rapidly increasing.   The water supply is obtained from the Connoquenessing creek which has been, until recently,

a stream of reasonably pure water, and is capable of furnishing a sufficient supply.   This it has done heretofore except during the excessively dry weather of the summer of 1893 and 1894 when the water became low and muddy.   To remedy this difficulty the water company has secured and brought to its pump station the water of a tributary called Bonniebrook.   The supply now at command is, in the opinion of the learned judge of the court below, more than sufficient in quantity, and in its native state is reasonably pure in quality.   But the basin which is drained by the Connoquenessing, or some portion of it, was thought to be underlaid with oil.   The drill was started and some oil was discovered in a stratum known as the " one hundred foot sand."   The defendants have within a year or so begun to bore wells down to this sand rock.   The oil found by them is diffused through the rock mixed with water.   The mixture is pumped into large tanks where the oil rises to the surface, while the water, which is about ninety-five to ninety-eight per cent of the whole, is drawn off at the bottom and allowed to run out upon the surface of the ground.   These wells yield not far from twelve to twenty barrels of oil and from eight to twelve hundred barrels of water per day each.   From their several wells the defendants are pouring about five thousand barrels of salt water into the stream above the dam of the water company every day ; and it would seem that as much or more is turned upon the ground from the wells of other operators who commenced operations since the defendants' wells, or some of them, were finished.

The water of the stream has become so strongly impregnated with salt and other mineral substances in consequence of these operations that the learned judge found the fact to be that the water had become wholly unfit for domestic uses or for steam, and could be utilized only for flushing sewers or extinguishing fires.   The results are, a discontinuance of the use of the water by the public, a loss of revenue to the company, an order made by the learned judge requiring the company to furnish pure water, and an injunction against the collection of any water rents for water furnished for domestic or for steam purposes until pure water is furnished.   The defendants have thus destroyed the business and the franchises of the company and the water supply of a town of ten thousand inhabitants.   A remedy

for the private injury thus sustained by the water company may be looked for in an action at law in the name of the injured party. The remedy for the loss sustained by the public is in a court of equity in the name of the commonwealth and at the relation of the attorney general. The object of the first is damages. The object of the second is the assertion and maintenance of the public right. But the interests of the water company and those of the public, though not identical, are closely related. The furnishing of water to the public is like the furnishing of light and heat for domestic purposes, a "public use:" Mills on Eminent Domain, par. 18; the importance of which is recognized by the legislative department of the government in granting to the corporations organized to supply or provide for this public use authority to exercise, as the representatives of the commonwealth, the right of eminent domain. By reason of this public interest in the business of the company, the state assumes a visitorial control over it, inquires into the quantity and quality of the water furnished by it, and makes such orders as may be necessary to secure for the public a wholesome and an adequate supply. The business of the oil and coal operator is a private use. Such business has a certain relation to the general volume of business being carried on in the region, but it is not to be distinguished from the production or manufacture of other commodities in common use, and that enter into the commerce of the country. Such operations may be begun or relinquished, increased or diminished, at the will of the operator without public interference or control; but the supply of water, light and heat, is necessary to the health and comfort of densely populated districts and is not left to the absolute control of the companies undertaking to provide it. The state in the exercise of its police power asserts its right to inquire into the efficiency and good faith with which "the public use" is served, and to correct, through the courts, any defects or abuse in the conduct of the business of gathering or distributing the supply, or of securing a quality of the commodity furnished that is suitable for use. Now we have in this case a somewhat startling state of things.

The learned judge has found in substance that but for the recent introduction of salt water into the stream the Conno-

quenessing and its tributary the Bonniebrook would afford an
ample supply of water for the borough of Butler of a reason-
ably pure quality.

  . In the case of Brymer et al. v. The Butler Water Co., he
nas directed the company in the most peremptory manner to
provide reasonably pure water, and in sufficient quantity for
the public use, and enjoined against the collection of water rents
until this order is obeyed.    In this case in which the water
company asks the court to protect the stream, on which it is de-
pendent, from contamination, the relief prayed for was refused.
" Your business " says the court below "is a public one and
you must furnish wholesome water to the borough of Butler."
When the company seeks the aid of the court to protect the
water supply so that it may be able to furnish suitable water,
the answer is " your business is a private one; your grievance
is for a mere personal inconvenience and for a personal injury ; "
you are therefore within the rule laid down in Sanderson v. The
Coal Company, 113 Pa. 126, and you are remediless.

  In Sanderson's case the coal company had by opening a coal
mine on its own land polluted a stream of water used by San-
derson for domestic purposes.    His grievance was for a " per-
sonal inconvenience and a personal injury " suffered as the
result of the opening of the mine by one whose land was higher
up the stream than his own.    It was held that as between two
property owners the lower holds subject to the easement which
the position of his property imposes, and that he cannot be
heard to complain of the inevitable consequences of the devel-
opment by the higher owner of his own property in a lawful
manner and without malice or negligence.    So far as the busi-
ness of the water company may be regarded as a private
business the deduction of the learned judge from Sanderson v.
The Coal Co. was a legitimate one.    The real question raised
however by the water company was that which was suggested
by the character of the business in which it was engaged, the
duties which that business imposed, and the obligations to the
public that necessarily resulted.    Do these considerations re-
lieve to any extent against a rigorous application of the doctrine
of Sanderson v. The Coal Co. to the plaintiff in this case ?
This question does not seem to have been considered in the
court below.    It is raised by the pleadings and the evidence

and it should be considered and decided. The more important question however, and that to which we referred at the outset as new, may be stated thus: Is a city as helpless to protect the water supply on which it depends as Sanderson was held to be? Does a great municipality stand on the same ground, when the water supply for its multitudes of people is under consideration, as a single property owner must stand under Sanderson v. The Coal Co.? This question was wholly untouched in the court below because the learned judge denied the commonwealth which had intervened in behalf of the public the right to be heard.

The fourth finding of law declared that the state was "a party in name only," and that neither "the records nor the evidence disclosed any real plaintiff or complainant other than the water company." Notwithstanding the name of the commonwealth had been put on the record as a plaintiff at the instance of her attorney general, and notwithstanding the conclusive evidence of the destruction of the water supply for all domestic purposes, on which the borough of Butler had been dependent for many years, the case was disposed of on the narrow ground covered by the rule in Sanderson's case. The error of the learned judge lies in this treatment of the case. By this we must not be understood as holding that the rule applied by the learned judge is not applicable so far as the "mere personal inconvenience" or injury of the water company is concerned, but that the "public use" served by the company, and the public need of an adequate water supply affecting the health and comfort of thousands of citizens have not been considered at all. We cannot now take notice of and determine these questions, for there are additional findings both of fact and of law that should be made before this can be intelligently done. Among other subjects to be examined and passed upon are these: What was the situation of the valley or basin of the Connoquenessing when the water company appropriated the stream for the supply of Butler borough? Was it at that time a developed oil field or not? At what date did the pumping of salt water into the stream begin? What is the value of the daily or monthly output of oil by the defendants from their wells? What would be the approximate cost of conducting the salt water either by surface drain or by pipes to some

point below the plaintiff's dam? Can the salt water be relieved of its salt by subsidence or filtration by the operator before turning it into the stream, and if so at what expense? Can the water of the stream be so cleansed by the company and at what expense? Can the plaintiff command a sufficient supply of water by going above the defendants' wells for it, and could they then obtain pure water? If so, what would be the probable cost of such a change in the plant of the water company?

When the case has thus been fully heard on its facts the questions we have suggested can be considered, and it will be practicable to say whether a great city stands on no higher ground, when the health and comfort of many thousands of its citizens are at stake, than Sanderson, when his private waterworks and fish pond were rendered useless by mine water. Whether in other words the commonwealth in the exercise of its police power may not limit and restrict the individual in the exercise of admitted rights, when the welfare of the public requires it; or whether it is indeed true that the ownership of a few acres of land, or a leasehold interest therein, gives to the holder an unqualified right to destroy the water supply of a city in the effort to develop some subterranean value in his land. If this unqualified right resides in the owner of the land then it is not easy to see how the water company is in default for failing to do what it is thus determined it has no power to do, viz, to protect the stream from pollution by the landowners within its basin. There would seem upon this view of the law to be no remedy provided for the public or the water company. The latter must lose its plant, its business, and for all practical purposes its franchises. The former must suffer the pollution and the actual deprivation of its water supply. The court can require the company to be diligent in its efforts to procure for the municipality a sufficient supply of pure water, if it can be had from sources reasonably accessible to its plant, and it can restrain the collection of rents if such water is not furnished. It cannot however require the company to relocate its plant or to seek a new supply to reach which would involve an expense greater than its entire capital stock. The location of the plant and the selection of the water supply is for the company to determine. The sufficiency and character of the supply may

be investigated by the court and the company required to meet fairly the public use it has undertaken to serve or cease to collect charges therefor. The owner of the oil well however is thought to be independent both of the water company whose plant he destroys and of the public whose water supply he pollutes. The mere fact that the plant is owned by a corporation was rightly held by the court below to furnish no room for a distinction between Sanderson's case and this. Corporations hold their titles, as individuals do, under the commonwealth, and subject to the same incidents as other owners. This is well settled. Among the more recent cases on this subject is the Appeal of the Pittsburg Junction R. R. Co., 122 Pa. 511. But in all these cases so far as I am familiar with them, the private right of the corporation was invaded. The public interest was not affected and therefore not considered.

The question of the status of the public is now clearly raised. It should be fully considered and decided.

More than one hundred and fifty years ago the necessities of civilized society had led to the general adoption of the definition of liberty which was formulated by Blackstone. It was seen that civil liberty required that other interests than those of the individual should be reckoned with, and that each person must be held to have surrendered such of his natural ·rights upon coming into society as could not be asserted consistently with a due respect for the rights of others and for the public good.

For myself I can see no reason why our duty towards others ought not to place limits upon our rights of property similar to those which it has put upon our natural rights of person. Sic utere tuo ut non alienum lædas expresses a moral obligation that grows out of the mere fact of membership of civil society. In many instances it has been applied as a measure of civil obligation, enforceable at law among those whose interests are conflicting. Whether it is capable of general application, and whether it is applicable when the interests of the public and those of an individual are irreconcilable, is an open field for inquiry into which this case leads.

The decree is reversed and the record remitted for further proceedings in accordance with this opinion.