# Pennsylvania R. R. et al., Appellants, v. Sagamore Coal Co. et al.

*Water companies—Public use of water—Use by communities—Use by railroad company—Pollution of streams—Nuisance—Mining operations—Prescriptive right—Eminent domain—Riparian rights—Equity—Maxim.*

1. Domestic uses of water are its natural and primary ones.

2. Riparian owners have no such property-right in a stream as to give them the right to pollute it with refuse from mines, to the detriment of the public. Pennsylvania Coal Co. v. Sanderson, 113 Pa. 126, commented upon and distinguished.

3. A landowner on a watercourse, whose rights are only those of a riparian proprietor, cannot have such rights enlarged to one of property in the use of the water, by the discovery or development of coal on his lands.

4. A condition which annoys or offends a single individual, may not be held a nuisance while it would be if the public were annoyed and complaining.

5. It is a nuisance to pollute a stream from which the public gets its supply of water.

6. There can be no prescriptive right to pollute a stream to the detriment of the public.

7. The use of the water of a stream by many people, is what makes its use a public one, and not the fact of how the water is taken from the stream, whether in the mains of a water company or by the public in buckets.

8. The use of water for the engines of a railroad company to transport the public is a public use.

9. A railroad company may own all the stock of a water company which supplies it with water for the transportation of the public.

10. A water company whose whole stock is owned by a railroad company may contract with other water companies chartered to supply water to communities, to furnish such companies with all its surplus water after the railroad is supplied.

11. It is not necessary to constitute a public use of water that it shall be taken under the right of eminent domain.

12. A water company which has not itself exercised the right of eminent domain by entering upon land, may secure its water for public use by contract with a company which has the legal power to store and furnish water.

234 PENNA. R. R. et al., Appel., *v.* SAGAMORE COAL CO. et al.

Syllabus—Statement of Facts.          [281 Pa.

13. Settlement by an eminent domainer with one whose property has been appropriated is equivalent to the full and complete exercise of the power of eminent domain.

14. Upper riparian owners are deprived of nothing by the appropriation of the water below them, and are therefore not entitled to damages from a water company appropriating such water.

15. Where a water company starts proceedings to condemn water of a stream, and its right is challenged by an older company operating further up the stream, and such proceeding culminates in a contract by which the upper company agrees to furnish water to the lower company, the arrangement is the same as though the proceedings had been carried through to a finality, and the lower company had secured its rights by the actual exercise of the power of eminent domain.

16. Where, on a bill in equity to restrain the pollution of a stream by the discharge into it of the refuse of coal mines, the court enters a decree for plaintiffs, it will also direct that plaintiffs, so far as it can reasonably and legally be done, shall afford defendants an opportunity to transport and dispose of the mine water in such a way as shall minimize the expense of so doing.

17. Such a decree should be entered because the public has an indirect interest in the business of defendants, and also because the plaintiffs in seeking equity should do equity.

Argued May 27, 1924. Appeals, Nos. 179-186, Jan. T., 1924, by plaintiffs, from decree of C. P. Fayette Co., Nos. 1023 and 1053, in equity, dismissing bills in equity in suits of Pennsylvania R. R. Co., Dunbar Water Supply Co., Mountain Water Supply Co., Westmoreland Water Co. and Commonwealth of Pennsylvania ex rel. the Attorney General, v. Sagamore Coal Co. et al. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Reversed.

Bills for injunction. Before VAN SWEARINGEN, P. J. The opinion of the Supreme Court states the facts. Bills dismissed. Plaintiffs in the two bills appealed.

*Errors assigned* were, inter alia, decrees, quoting record.

*George E. Alter,* Special Attorney for the Commonwealth, with him *George W. Woodruff,* Attorney General, for the Commonwealth.—The Sanderson Case has no application: Sullivan v. Steel Co., 208 Pa. 540; Com. ex rel. v. Russell, 172 Pa. 506; Com. ex rel. v. Hanratty, 60 Pitts. L. J. 13.

The right of eminent domain is not essential here: Com. v. Yost, 197 Pa. 171; Lord v. Water Co., 135 Pa. 122; P. & R. R. R. v. Water Co., 182 Pa. 418; Haupt's App., 125 Pa. 211; Boalsburg Water Co. v. Water Co., 240 Pa. 198.

There is clear legislative authority for the Mountain Water Supply Company to acquire the right to take water of streams.

Defendant has no property-right to pollute stream: Com. ex rel. v. Hanratty, 60 Pitts. L. J. 13; Com. v. Emmers, 221 Pa. 298.

The Westmoreland Water Company is a public agency, to which the Mountain Water Supply Company furnishes water.

The Westmoreland Water Company acquires the water of Indian Creek from the owner of all necessary rights.

*R. W. Smith,* of *Smith, Best & Horn,* with him *Sturgis & Sturgis,* for Westmoreland Water Company and Commonwealth of Pennsylvania ex rel. Attorney General, appellants.—The interest of Westmoreland Water Company and its consumers in the waters of Indian Creek was legally acquired: Williamsport R. R. v. R. R., 141 Pa. 407.

Defendants did not establish that the pollution of the waters of Indian Creek could not be prevented except by unreasonable expenditure: Clouse v. Crow, 68 Pa. Superior Ct. 248; Pfeiffer v. Brown, 165 Pa. 267.

If the coal in the Indian Creek valley were operated as a unit and from a single opening at the extreme low point in the basin, to that point substantially all the

236 PENNA. R.R. et al., Appel., *v.* SAGAMORE COAL CO. et al.

Arguments. [281 Pa.

waters of the mine could be carried by gravitation and that point of opening and drainage would be below the dam of the Mountain Water Supply Company: McCune v. Coal Co., 238 Pa. 83; Com. ex rel. v. Russell, 172 Pa. 506; Robertson v. Coal Co., 172 Pa. 566.

*Francis I. Gowen* and *Paul H. Gaither,* with them *R. Kay Portser, R. Kirk McConnell* and *R. W. Playford,* for Mountain Water Supply Company, the Pennsylvania Railroad Company, and the Commonwealth of Pennsylvania ex rel. Attorney General, appellants.—The purchase of all the capital stock of a water company by a railroad company in order to enable it to secure an adequate supply of water for its necessary corporate purposes constitutes the taking of the waters of a stream by the water company a taking for public use: U. S. v. Reading Co., 253 U. S. 26.

The flow of sulphur water from coal mines into a stream is not a property right: Irving v. Media, 194 Pa. 648; Sullivan v. Steel Co., 208 Pa. 540; McCune v. Coal Co., 238 Pa. 83; Com. v. Russell, 172 Pa. 506; Pfeiffer v. Brown, 165 Pa. 267.

The "furnishing of water......for manufacturing and other purposes" to seventy-five thousand people and to a great railroad system must certainly make this a great public use and a great public interest: Jacobs v. Water Supply Co., 220 Pa. 388; Windsor Glass Co. v. Carnegie Co., 204 Pa. 459; Yoho v. Allegheny County 218 Pa. 401.

*Wm. M. Robinson, E. C. Higbee* and *Edwin W. Smith,* with them *Shelby, Henderson & Hackney, McDonald & Cray, Umbel, Robinson, McKean & Williams, John S. Brooks, Jr., Samuel A. Gilmore, John S. Christy, Joseph W. Ray, Jr., W. D. N. Rogers, Sterling, Higbee & Matthews* and *Reed, Smith, Shaw & McClay,* for appellees.— The right of appellee to mine their coal in the ordinary, usual and only practical method is property: Penna. Coal Co. v. Sanderson, 113 Pa. 126; Robb v. Carnegie,

145 Pa. 324; Good v. Altoona City, 162 Pa. 493; Evans v. Fertilizing Co., 160 Pa. 209; Hauck v. Pipe Line Co., 153 Pa. 366; Alexander v. Coal Co., 254 Pa. 1; Jackman v. Rosenbaum Co., 263 Pa. 158; Strauss v. Allentown, 215 Pa. 96; Phila. & Reading R. R. v. Water Co., 182 Pa. 418; Lord v. Water Co., 135 Pa. 122; Phillipsburg Water Co. v. Water Co., 189 Pa. 23; Com. v. Yost, 197 Pa. 171; Penna. R. R. Co. v. Miller, 112 Pa. 34; Scranton Gas & Water Co. v. R. R., 240 Pa. 604; Mahon v. Coal Co., 274 Pa. 489.

Appellees can be deprived of their property right only by the exercise of the power of eminent domain: Com. ex rel. v. Coal Co., 256 Pa. 328; Penna. Coal Co. v. Mahon, 260 U. S. 393.

The Mountain Company is not, as a matter of law, a public corporation having the power of eminent domain: Peifly v. Water Supply Co., 214 Pa. 340; Jacobs v. Water Supply Co., 220 Pa. 388; Bly v. Water Co., 197 Pa. 80.

Even if the Mountain Company were a public corporation having the power of eminent domain, its rights are only those of a private riparian owner, unless it has fully exercised its power of eminent domain: Penna. R. R. v. Miller, 112 Pa. 34; Phila. & Reading R. R. v. Water Co., 182 Pa. 418; Lord v. Water Co., 135 Pa. 122; Philipsburg Water Co. v. Water Co., 189 Pa. 23; Com. v. Yost, 197 Pa. 171.

Although the Water Company has the power of eminent domain, it has not exercised that power so as to divest appellees of their property rights: Underwood v. R. R., 255 Pa. 553.

There is no public service by plaintiffs in this case: Scranton G. & W. Co. v. R. R., 240 Pa. 604; Com. v. Kennedy, 240 Pa. 214; Mugler v. Kansas, 123 U. S. 623.

OPINION BY MR. JUSTICE SCHAFFER, September 29, 1924:

The Commonwealth and the other complainants in these cases appeal from the dismissal of their bills in

238 PENNA.R.R. et al., Appel., *v.* SAGAMORE COAL CO. et al.

Opinion of the Court.                    [281 Pa.

equity, through which they seek an injunction against defendants to prevent the discharge, by them, of acid mine waters into Indian Creek, in Fayette County. This stream is approximately 22 miles long, with a drainage area of about 130 square miles, and on it, at a point below defendant's mines, one of complainants, the Mountain Water Supply Company, has constructed a dam with a capacity of 251,000,000 gallons of water, and a reservoir capable of holding 6,500,000 gallons.

The discussion of the cases, both on oral argument and in the exhaustive briefs filed by able attorneys on both sides, took a wide range. In the view we take of it, the controversy compacts itself within closer bounds than it had in the minds of counsel, and although its public importance is very great, it is controlled by one fact and a single equitable principle: the fact that the stream has been polluted, and the principle that this creates an enjoinable nuisance, if the public uses the water.

We do not deem it necessary to fully investigate and determine the powers and the effect of certain corporate acts of the plaintiff water companies, to which counsel have given great attention, further than to outline some of the steps which were taken. The Mountain Water Supply Company is incorporated under the 18th clause of the second part of section 2 of the Act of April 29, 1874, P. L. 73, 74, as amended by the Act of May 21, 1889, P. L. 259, "for the storage, transportation and furnishing of water, with the right to take rivulets and land and erect reservoirs for holding water for manufacturing and other purposes, and for the creation, establishing, furnishing, transmission and using of water power therefrom." For its corporate purposes, it appropriated, by resolution, the waters of Indian Creek, as well as the necessary lands for the construction of dams, reservoirs and rights-of-way for the laying of pipes. It settled with the owners of the land appropriated and with the lower riparian owners on the stream.

This company was created by the Pennsylvania Railroad Company in order to provide a sufficient supply of pure water for use in operating its trains. The railroad company has constructed and maintains a system of water facilities to conduct the water from the reservoirs and lines of the Mountain Company, and to store it in small reservoirs, to be available when needed for its locomotives. This system of water facilities, maintained and used by the railroad company, comprises 131 miles of pipe lines, with ten reservoirs and four stand pipes. The cost of its installation by the water company and the railroad company was in excess of $4,000,000.

The Dunbar Water Supply Company is incorporated under the 9th clause of the second part of section 2 of the Corporation Act of 1874, P. L. 73, and its supplements, for the purpose of supplying water to the public in Dunbar Township, Fayette County. After incorporation, it appropriated, by resolution, the waters of Indian Creek at the reservoir of the Mountain Company. It has also appropriated rights-of-way necessary for the construction of pipe lines. When the improvements were completed by the two water companies, the railroad company, under the authority of the Act of April 22, 1905, P. L. 264, authorizing "railroad companies of this Commonwealth, in order to secure an adequate supply of water for their corporate purpose, to acquire, hold, dispose of, and guarantee the stock and securities of water companies," then purchased and acquired their entire capital stock.

The Westmoreland Water Company was incorporated September 24, 1886, as a public water company, likewise under the 9th clause of the second part of section 2 of the Act of April 29, 1874, P. L. 73, and its supplements. Its earlier corporate designation was the Westmoreland Water Company of Ludwick Borough. At the time it was chartered, seven other companies were created for other districts of Westmoreland County, these municipal divisions being Greensburg and adjacent boroughs and

240 PENNA.R.R. et al., Appel., *v.* SAGAMORE COAL CO. et al.

Opinion of the Court.                    [281 Pa.

townships. In the year 1904, each of these eight companies adopted resolutions appropriating a fractional interest in the waters of Indian Creek at a point near its confluence with the Youghiogheny River and below the dam of the Mountain Company, the sum of the appropriations representing the entire flow of the stream. Following this, each of these companies filed a bill in equity against the Mountain Company seeking to restrain the latter from diverting the water. This litigation was settled by the execution of a contract between the parties to the several suits, which provided for the furnishing of water by the Mountain Company to the other companies. Subsequently the name of the Westmoreland Water Company of Ludwick Borough was changed to Westmoreland Water Company, and it purchased the property and franchises of the other companies which had been created contemporaneously with it.

The resolutions appropriating the waters of Indian Creek by the companies which subsequently were aggregated into the Westmoreland Company, were adopted before any of the defendants, with one exception (and he owning but a small acreage), became the owners or lessees of the tracts of coal which they are now engaged in mining. At the time of these appropriations, and when the dam of the Mountain Company was built, in 1905, there was no injurious pollution of the stream; there then had been no commercial development of the coal. There were, however, a number of small country pits in operation, supplying coal in limited quantities to residents in the Indian Creek Valley, from the operation of which no injury had resulted to the waters of the stream.

Defendants operate mines on Indian Creek, and the drainage from them, greatly contaminated with acid, flows into the stream, above the dam of the Mountain Company, and pollutes it. The court below, on this subject, said: "There is no denial in the evidence of the fact that the drainage of the mine water from the mines

of the defendants into Indian Creek will injure the waters of the stream for both domestic and industrial uses. That was conceded throughout the trial of the case."

Plaintiffs allege that the draining of the mine water into the creek creates a nuisance. Defendants claim a right to so drain it and that this right is one of property, of which they cannot be deprived without due process of law and without compensation being first made or secured to them.

After the filing of bills in equity by the water companies and the railroad company to enjoin the flow of the mine water into the stream, a petition of more than 1,700 persons was presented to the attorney general, requesting, in the public interest, his intervention in the proceedings, and permission was given to intervene in the name of the Commonwealth.

Defendants invoke the rule laid down in Pennsylvania Coal Co. v. Sanderson, 113 Pa. 126, as sustaining the right to drain their mines into the stream. Over that decision and its applicability to the facts in the pending cases, the controversy was waged before the chancellor and before us. He held the ruling there made determines these proceedings in defendants' favor. We are of opinion that the Sanderson Case does not control the ones in hand. The chancellor further concluded that the several water companies had not appropriated the waters of Indian Creek for public use; that the Mountain Company did not possess the power of eminent domain, and that neither the Dunbar Company nor the Westmoreland Company had exercised that power; that as there had not been a fully completed exercise of it, there was no appropriation of the waters of the creek for public use, and that, as the waters had not been legally so appropriated, there was no public interest which warranted the intervention of the Commonwealth; invoking the rule of the Sanderson Case, he dismissed the bills.

Whether the Mountain Company has the power of eminent domain or whether the Dunbar Company and the Westmoreland Company, possessing it, lawfully exercised it, is of no consequence. These cases do not lie within the narrow realm of legal formalities. This stream of pure water (one of the very few unpolluted ones in the section of the State where it is located) was impounded, primarily, for the purpose of furnishing uncontaminated water, to supply the motive power which is essential to the operation of one of the great railroad systems of the country. This primary purpose having been met, a large part of the surplus water, approximately 3,000,000 gallons per day, is being taken, by agreement between the Mountain Company and the Westmoreland Company, from the reservoir of the former and supplied by the latter to 75,000 people in thirteen municipal divisions of the Commonwealth for domestic uses. This being the fact, it is idle to say that the water is not being devoted to public use. It would never do to permit a screen of effete legal formalism to be raised to shut out the view of what actually exists in such a situation as here confronts us. It could not be averred, with wisdom and truth, that there is no public interest warranting the Commonwealth's intervention, when the water supply of such a large number of persons is involved. Nor do we think it can properly be held that the use of the water by the railroad company is not a public one. The water is devoted by it to the furnishing of power to transport the public; without water uncontaminated by acid, the railroad could not be operated. If authority were needed for the proposition that the water furnished to the railroad company is for a public use, it can be found in Bland v. Tipton Water Co., 222 Pa. 285, 289, where it is said: "In daily furnishing to the engines of the railroad company 350,000 gallons of water in that township, the water company is not exercising a mere right but performing a duty, for the railroad company, in the operation of its road in

said township, is to be regarded as a part of the public therein."

The first error, into which the court below seems to have fallen, was in holding that, to constitute a public use of the water, it must be taken under the right of eminent domain, and that there had been no exercise of this power by any of the plaintiff companies. The reason given for the conclusion that the Westmoreland Company and the Dunbar Company had not exercised the power of eminent domain, which each of them possesses, was because the resolutions which they adopted "were not followed by entry upon the ground and because no compensation ever was made or secured to defendants or their predecessors in title." In view of the agreement made by these two companies with the Mountain Company, which had the right, under the act authorizing its incorporation, to store and furnish the water, nothing further was required to be done by them. So far as the defendants are concerned, no compensation was due to them, because as upper riparian owners they were deprived of nothing by the appropriation of the water below them. The chancellor would also seem to have overlooked the rule, that settlement by an eminent domainer, with one whose property has been appropriated, is equivalent to the full and complete exercise of the power of eminent domain: Boalsburg Water Co. v. State College Water Co., 240 Pa. 198; Hendler v. Lehigh Valley R. R. Co., 209 Pa. 256; 2 Lewis on Eminent Domain (3d ed., 1909) 845. One of plaintiff companies, the Westmoreland, and those affiliated with it, started proceedings to condemn the waters of the stream, their right to do so was challenged by the Mountain Company, whose interests in the creek were not only those acquired in pursuance of its charter, but those of a riparian owner as well. These proceedings culminated in a settlement and agreement for the taking of the water; this was the same as though they had been carried through to a finality. However a corporation possessing the power of

244  PENNA.R.R. et al., Appel., *v.* SAGAMORE COAL CO. et al.

Opinion of the Court.                    [281 Pa.

eminent domain acquires its rights, whether by purchase or condemnation, the rights acquired are the same; there is no magic in getting them under the power of eminent domain.  Formal entry is not, as the court below seemed to think, requisite.  The day for going through ceremonies in the law of property has passed; such symbolism as that involved in the handing over of a twig or clod of earth to indicate the passing of title is in the limbo of things well nigh forgotten.  In the very recent case of Palmer Water Co. v. Lehighton Water Supply Co., 280 Pa. 492, we determined that a water company actually located on a stream, and supplying water therefrom to the public, should be confirmed in its rights to so furnish it, as against the claim to the entire flow of the stream by another water company, subsequently created, even though the prior locating company had not strictly complied with the law in appropriating the water.  The language of Mr. Justice KEPHART in that case has strong pertinence to the ones in hand (p. 498) : "Here we have the Lehighton Company, occupying the upper stream from which it supplied the public for some years before the Palmer Water Company existed, thrown off the stream because its board of directors failed to go through a form to appropriate the stream, though every other act of the company was consistent with the proper performance of its duties and obligations resting on it as a public servant."  We there reiterated long-ago used language of our predecessors in saying "the domestic uses of water are its natural and primary ones."

The lower court's ruling, so far as the Mountain Company is concerned, if carried to its logical conclusion, would mean that that company can take the water only as a riparian owner can.  The legislature, however, in endowing that company with power, indicated otherwise, and granted it prerogatives much beyond those of a riparian owner, but, even if it were nothing more than a riparian owner, having acquired the rights of all the

lower ones on the stream, it could divert the water and furnish it, as it is furnishing it, to the two other water companies, and defendants as upper riparian owners could not complain.

In their printed brief, counsel for appellees "concede without hesitation that if the Mountain Water Supply Company had the right to take the water from Indian Creek, it makes no difference how it carries or transports it, if it is devoted to a public use." The Mountain Company has the right to take the water from the creek under the express terms of its charter, and no one can gainsay this right except lower riparian owners. As it has acquired all such interests, its right to take the water cannot be successfully challenged. The water which it has the right to take is devoted to public use in two aspects, in that it goes to the public through the Westmoreland Company for domestic consumption and to the Pennsylvania Railroad Company for use by the latter in connection with the public service which it performs.

The court seems to have relied, for its determination that there is no public use of the waters of Indian Creek, on Com. v. Yost, 197 Pa. 171. If that case decided, under a state of facts at all comparable to those before us, what the chancellor conceived it to decide, it would not be followed by us now; but it does not determine that where a water company has acquired the right to the waters of a stream, by other than condemnation title, its only rights are those of a riparian proprietor and therefore private. That proceeding was a prosecution for committing a public nuisance in polluting a stream from which the York Water Company obtained water. There was no evidence that the water company had any right to divert the water or appropriate it for any purpose save as a riparian owner. It was held under this state of facts that the nuisance was not shown to be a public one, and hence a conviction could not be sustained. It was pointed out in the opinion that "If the public have

246 PENNA. R. R. et al., Appel., *v.* SAGAMORE COAL CO. et al.

Opinion of the Court.                    [281 Pa.

a right to receive pure water through the agency of a corporation legally authorized to take it from a stream, he who pollutes it offends against the public." In the pending cases, the three water companies have the right to take the waters of the stream, to a greater degree than would ordinary riparian owners, and the only deficiency in their right which the trial court points out is the lack of the fully completed exercise of the power of eminent domain by the Westmoreland and Dunbar Companies (we are passing the question whether the Mountain Company possessed the power at all). If in Com. v. Yost, it had appeared that the water company acquired the right to divert the water by purchase from all the lower riparian owners, it certainly would not have been held that its use of the water was not a public use and the nuisance not a public one.

Water companies incorporated since the Act of April 13, 1905, P. L. 152, have no power of eminent domain. If the lower court's view that water companies can be guaranteed the purity of their supply only by using eminent-domain proceedings to acquire it be correct, then such companies as have been called into existence since the passage of that act are at the mercy of any mine which might be opened along their source of supply.

Having determined, for the reasons to which we have referred, that there was no public use of the water, the court below proceeded to apply to the controversy the rule of the Sanderson Case. As we have shown, the conclusion reached that there was no public use of the water was fallacious. We have, therefore, a situation where the waters of a stream are devoted to public use. Does the Sanderson Case apply under these circumstances? That litigation did not involve the rights of the public to the waters of streams in any sense. What was affected by the pollution of the stream was the private concern of that plaintiff. The case was determined on the balancing of the "necessities of a great public industry"

and a "mere personal inconvenience." It was said: "The community does not complain on any grounds. The plaintiff's grievance is for a mere personal inconvenience and we are of opinion that mere private personal inconvenience arising in this case and under such circumstances must yield to the necessities of a great public industry, which although in the hands of a private corporation subserves a great public interest. To encourage the development of a great natural resource of a country, *trifling inconvenience to particular persons* must give way to the necessities of a great community." No language used in that opinion can be tortured into an implication that the waters of the Commonwealth can be polluted by its mines, where the public is affected as it is here. It has always been under our law a nuisance to pollute a stream from which the public gets its supply of water: Barclay v. Com., 25 Pa. 503; McCallum v. Germantown Water Co., 54 Pa. 40; Com. v. Emmers, 221 Pa. 298.

Such an injury as was shown in the Sanderson Case was held to be unredressable where the public is not involved. The rule there laid down is in consonance with that applied in many instances, where a condition is not held to be a nuisance which annoys or offends a single individual but which would be outlawed if the public were complaining.

So far as the use of the water is concerned it matters not how the public gets it, whether as customers of a water company or as riparian owners having the right to its domestic use. If there were a large number of riparian users on the stream in question, the public nuisance by pollution would be just the same. It is the use of the water by many people that makes its public use, in applying the nuisance doctrine, not the fact of how the water is taken from the stream for their use, whether in the mains of a water company or by them in buckets.

The error of the trial judge in this case was the same as that pointed out in Com. v. Russell, 172 Pa. 506, at page 520: "Is a city as helpless to protect the water supply on which it depends as Sanderson was held to be? Does a great municipality stand on the same ground, when the water supply for its multitudes of people is under consideration, as a single property owner must stand under Sanderson v. The Coal Company? ......Notwithstanding the name of the Commonwealth had been put on the record as a plaintiff at the instance of her attorney general, and notwithstanding the conclusive evidence of the destruction of the water supply for all domestic purposes, on which the Borough of Butler had been dependent for many years, the case was disposed of on the narrow ground covered by the rule in Sanderson's Case. The error of the learned judge lies in this treatment of the case." In Com. v. Emmers, 221 Pa. 298, we lent our sanction to what was said by the Superior Court, "But whether this extreme exception [in the Sanderson Case] to the general rule that a riparian owner has no right to pollute the waters of a stream could prevail against the right of the public is an entirely different question."

We now come to the consideration of the conclusion of the trial judge that the right to drain the mine water into the stream is a property right. To reach this determination, he gave to the Sanderson Case a much broader effect than it has ever before been given and overlooked how limited has been its application. It is somewhat difficult to understand why he badged the draining of the mine water into the stream as a "property right" in the defendants, of which they cannot be deprived except upon payment being made to them. Nothing said in the Sanderson opinion warrants such conclusion even from the standpoint of the private right involved and certainly not where public rights are at stake. No such term as a right of property was applied in that decision to the act of the mine owner in

polluting the stream. He was taken out of the rule that his act was one of nuisance, by the exceptional situation there existing, and it was expressly stated that the privilege accorded to him would not be sanctioned where the public is concerned. To say that there is no public concern in the use made of the waters of a stream which are supplied to 75,000 individual consumers shocks the common understanding. In Sanderson's Case, the court was most careful to state, "We do not say that a case may not arise in which a stream from such pollution may not become a nuisance and that the public interests as involved in the general health and well-being of the community may not require the abatement of that nuisance. This is not such a case." The ones in hand are. The most that could be said of what was accorded to the defendant in that much controverted case is, that it was a privilege. There could not be such a thing in the law as a property-right to do a wrong, unless, it was founded in prescription, which presupposes a grant, and no prescription was set up in that case. Indeed, "It is generally recognized that no right can be acquired by prescription to maintain a public nuisance. So it has been decided that there can be no prescriptive right to maintain an obstruction in the highway, or to pollute a stream to the detriment of the public": 2 Tiffany, Real Property (2d ed., 1920) 2031; Owens v. Lancaster, 182 Pa. 257, 262; 2 Lewis, Eminent Domain (3d ed., 1909) 866 note; Com. v. Sisson, 189 Mass. 247, 75 N. E. 619.

Dwight Printing Co. v. City of Boston, 122 Mass. 583, completely answers the claim set up by appellees of a right to pollute the stream, in view of the interest of the public in it. In that case, the City of Boston had appropriated the waters of a river as part of its water supply. A petition was filed by an upper riparian owner praying for an assessment of his damages upon the ground, among others, that the appropriation interfered with the petitioners' use of the water in bleaching and dyeing clothes. The Supreme Judicial Court of Massa-

250 PENNA. R. R. et al., Appel., *v.* SAGAMORE COAL CO. et al.

Opinion of the Court.                    [281 Pa.

chusetts, in disposing of the plaintiff's contentions, said (p. 587, 589) : "The riparian proprietors higher up still retain all their common law rights in the river, so far as they are not inconsistent with the use defined in the statute. They certainly are not prohibited from drawing water from the river for domestic purposes, or from watering cattle in it or from cutting ice......Another claim, put forward by the petitioner, is that the use which it proposes to make of the water of the river in bleaching and dyeing woolen and cotton clothes must befoul the water and render it unfit for drinking purposes, and that the statute in question deprives it of that right. But it is agreed that the petitioner has acquired no such right by any grant or prescription, and it is well settled that, as a riparian proprietor merely it has no such right. An injury to the purity or quality of the water to the detriment of other riparian owners, constitutes in legal effect a wrong and invasion of private right, in like manner as a permanent obstruction or diversion of the water." The title acquired by defendants, whether by grant or demise, gave them no property rights in the waters of the stream save those which pertained to riparian ownership; obviously this did not include the right to pollute the stream: Howell v. M'Coy, 3 Rawle 256; Com. v. Emmers, 221 Pa. 298, 304. It could not be said that a landowner on a watercourse whose rights in the stream are only those of a riparian proprietor (and none other is shown in defendants), would have them enlarged to one of property in the use of the waters by the discovery or development of coal on his lands.

Our conclusion is that defendants have no right of any kind to drain their mine waters into the stream considering the public use which is made of its waters and that their so doing constitutes a nuisance which must be restrained.

We recognize, however, as evidently the court below also did, that the public has an indirect interest in the

business of defendants, and hence, applying the principle that he who seeks equity must do equity, the decrees to be entered should require plaintiffs (other than the Commonwealth), so far as this can reasonably and legally be done, to afford defendants an opportunity to transport and dispose of the mine water of their respective mines in such a way as shall minimize the expense of so doing; and the decrees, after their entry, should be enforced in the same equitable spirit. In fairness to plaintiffs it should be stated that their counsel, in oral argument at the bar of the court, expressed the willingness of their clients to thus coöperate with defendants.

The decrees of the court below dismissing plaintiffs' several bills of complaint are reversed, the bills are reinstated, and it is directed that the court below shall enter decrees, enjoining and restraining defendants, and each of them, from discharging, pumping or causing or permitting to flow or to be discharged, any drainage of mine water from their mines, and from the mines of each of them, into the waters of Indian Creek, or its tributaries, above the dam of the Mountain Water Supply Company, after the expiration of six months from the date of the entry of the decrees. It is further directed that defendants shall pay the costs.*

---

*An appeal in this case to the Supreme Court of the United States was refused.